——IN THE——

# SUPREME COURT OF MISSISSIPPI,

——AT THE——

75   1
87  469

## MARCH TERM, 1897.

---

## TOWN OF LEXINGTON *v.* UNION NATIONAL BANK.

1. MUNICIPAL BONDS. *Irregularities. Renewal.*

   Where a municipality issues bonds, and afterwards, by legislative authority, renews them, substituting new bonds for the original ones, irregularities in the issuance of the old bonds will not avoid the new ones.

2. SAME. *Signing. Attestation. Coupons.*

   Municipal bonds, signed by the mayor and attested by the town clerk in conformity with the act authorizing their issuance, are not rendered invalid by the omission of the clerk to attest the interest coupons thereto attached; nor are the coupons invalid by reason of such omission.

3. SAME. *Bearer. Delivery.*

   Municipal bonds, issued under legislative act requiring them to be executed to a railroad company, and delivered to the president or treasurer thereof, are not invalid because payable on their faces to "bearer," if they, so payable, are delivered as required.

4. SAME. *Renewal. Like tenor.*

   Municipal bonds, issued in denominations of one thousand dollars, which are given in renewal, under legislative authority, for old bonds issued in denominations of fifty dollars, are not invalid be-

75 Miss.—1

cause the act authorizing the renewal provides that the new bonds shall be of "like tenor with the old ones."

5. SAME.   *Date.   Recitals.*

   Municipal bonds lithographed as of a certain date according to the legislative authority for their issuance, and reciting that they were issued under such authority, are not rendered invalid by the fact that they were not delivered until afterwards, and show on their faces the true date of delivery.

6. SAME.   *Coupons.   Interest.   Lithographed signatures.*

   Coupons, issued with and as part of a municipal bond, maturing at fixed dates, bear interest after their maturity; and such coupons are not invalid because the signature of the officer thereto is lithographed.

7. SAME.'   *Estoppel.*

   A municipality may estop itself from setting up irregularities in their issuance as a defense to its bonds.

FROM the circuit court of Holmes county.

HON. W. F. STEVENS, Judge.

The facts are sufficiently stated in the opinion of the court.

*Noel & Pepper, Hooker & Wilson,* and *Tuckett & Smith,* for appellant.

If in the pursuit of the history of these bonds it should be ascertained that such bonds were not authorized by or were not in conformity with the statute under which they purport to have been issued, they are illegal in the hands of every person, whether a *bona fide* holder or not.   The investor would be supposed to know that without legislative authority municipal corporations cannot invest its obligations with the character and incidents of commercial paper.   Jones on R. R. Securities, §§ 222, 226, 283. , The statute did not, in words or effect, give the officers any such power, and it was *ultra vires* to execute an obligation not authorized in terms by the legislature.   The municipal authorities could do but one thing, and that was to execute the bonds in the mode and manner directed by the statute.   They were pur-

posely and intentionally cut off from making negotiable bonds. Observe the language: "And he [the mayor] shall execute to said company, in the name of such town, bonds, and said bonds shall be delivered to the president or treasurer." The words, *ex vi termini*, exclude power to issue a negotiable bond. He can only deliver to the president bonds executed to the company. The word "execute" is used in its ordinary sense, as if I "execute" a note or deed to A B, the note is payable, or the deed is, to A B.

The investor, examining the law, would have observed that not only was there lack of authority to issue negotiable bonds, but that so to do was actually prohibited. *Expressio unius exclusio alterius*. He would see from the act of 1884, first, that the act was a permissive one to extend the bonds issued. He would see that the legislative intent was to deal with the town—the people of the town. The permission was given to the people as a corporation, and not to the officers, to renew. A majority of the people might have been, and possibly were, opposed to the extension, especially upon the terms imposed by the act. The legislature certainly did not intend to force the people, or to permit them to be forced, to an extension of this debt, upon the onerous conditions imposed by officers, without their consent, and yet this is exactly what was done. Our contention is that the language of the statute, especially taken in connection with the previous legislation on the subject, and the origin of the bonds, gives no power to the officers to renew the bonds, but leaves the question with the people. New bonds could not be lawfully issued without consent, expressed in an election held for that purpose.

If, in searching the history of the legislative record of these bonds, the imaginary investor should disagree with us in our judgment as to the intent and scope of the first section of the act of 1884, as well as in other matters hereinbefore alluded to, his next inquiry must necessarily be: Have the corporate authorities of the town of Lexington complied with the law author-

izing them to renew the bonds? Are they, in form and kind, such as were authorized to be issued? If they differed materially from the obligations the legislature authorized, their issuance was *ultra vires*, and the bonds void. What variations were permitted? What was the form and kind of bonds permitted to be issued? What incidents pertain to these new bonds that did not pertain to the old? The bonds authorized to be issued were to be of like tenor of the outstanding bonds, except as to the date of bonds, date of maturity of bonds and coupons. The statute does not provide that the bonds shall be of the same "import" or "purport" or "effect" or similar words, but of like "tenor." The word "tenor" has a technical meaning, an "exact copy." 25 Am. & Eng. Enc. L., 946. The renewal bonds are each for one thousand dollars; the old bonds were each for fifty dollars. Certainly they are not of the same "tenor" in this respect. The old bonds recite "that this bond is one of a series of bonds issued in payment of a donation of twenty-five thousand dollars." The new bonds recite "issued in part payment of a donation," etc. What possible right did the municipal authorities have to make such a change in the bond? The recitals are certainly not of the same "tenor," effect, or purport.

Other objections to the validity of the bonds, which we think fatal to plaintiff's right of recovery, are the fact that the bonds were not dated May 1, 1894, as provided in the statute, and the coupons of the original bonds were signed by the mayor, while those to the substituted bonds had the signature of the clerk lithographed.

If a statute makes signature of a particular officer essential, they are not the bonds of the corporation without such signature. 15 Am. & Eng. Enc. L., 1227.

Where the mode of the exercise of a power is prescribed, it is the measure of power, and must be followed. 15 Am. & Eng. Enc. L., 1042; *Zattman* v. *San Francisco*, 20 Cal., 96.

*Miller, Smith & Hirsh*, for appellee.

The courts, for twenty-five years or more, all over this country, have been filled with cases involving issuance of bonds by cities, towns and counties in aid of railroads, and every question conceivable has been raised by these cases and adjudicated. Among the questions so adjudicated is the question that a municipality, through its officers, may so act as to ratify the issuance of bonds, which were, in their inception, irregularly issued. Jones on Railroad Securities, sec. 282, lays this down as the law upon this point: "A municipality or corporation may, by the payment of interest, or by holding stock received for the bonds, or by other acts, become bound to pay bonds issued in its name, although the execution of them was irregular or without authority. Ratification may also be inferred from long delay in taking advantage of the irregular or unauthorized issue of municipal bonds, though such ratification is doubtless more cautiously inferred in cases of municipal corporations than private corporations, because experience shows that public officers do not guard the interest confided in them with the same vigilance and fidelity that characterizes the officers of private corporations." *L., L. & C. Railroad Co.* v. *Douglas*, 18 Kan., 169; *Pendleton Co.* v. *Amy*, 13 Wall., 297; *County of Ray* v. *Vansycle*, 96 U. S., 675, s.c. 99 U. S., 684; *Campbell* v. *Kenosha*, 5 Wall., 194; *Mercer Co.* v. *Hackett*, 1 Wall., 83; *Merchants' Bank* v. *State Bank*, 10 Wall., 645; *Aurora* v. *West*, 17 Wall., 105; *Smith* v. *Sac Co.*, 17 Wall., 150; *Lexington* v. *Butler*, 14 Wall., 296; *Davenport* v. *United States*, 9 U. S., 414; *San Antonio* v. *McHuffey*, 96 U. S., 314; *Randolph Co.* v. *Post*, 93 U. S., 514; *Venice* v. *Murdock*, 92 U. S., 500; *Columa* v. *Eaves*, 92 U. S., 491; *Lyons* v. *Munson*, 99 U. S., 686; *Orleans* v. *Platte*, 99 U. S., 682; *Pumpton* v. *Cooper Union*, 101 U. S., 204; *Brooklyn* v. *Ins. Co.*, 99 U. S., 363.

The original bonds in this case were surrendered and destroyed by the defendant or appellant, and these new ones were

delivered by the appellant to appellee in exchange for the old ones, and eleven years' interest has been paid thereon.

The seventh paragraph of appellants' answer attempts to raise the question that the issuance of the twenty thousand dollars' worth of bonds in lieu of the original ones, taken up under the act of 1884, was never submitted to a vote.    "It being once admitted that the city authorities had the power to issue these bonds, that undoubtedly carried with it the authority to renew the bonds or to take them up and supply their place with other bonds." *Portsmouth Savings Bank* v. *City of Springfield,* 4 Fed. Rep., 275; *Lloyd* v. *City of Altoona,* 19 Atl. Rep., 675; *Little Rock* v. *National Bank,* 98 U. S., 308; *Ragan* v. *Waterton,* 30 Wis., 259; *City of Galena* v. *Corwith,* 95 Am. Dec., 557; *Merrell* v. *Town of Monticello,* 25 Fed. Rep., 589; *Rates* v. *Gregory,* 22 Pac. Rep., 683; *Blanton* v. *McDowell,* 101 N. C., 532; 15 Am. & Eng. Enc. L., 1263.

As to the other point suggested in this paragraph of appellant's answer, that the bonds were not of like tenor, it will be noted the new bonds impose no extra or additional liability upon the town of Lexington.    The effort to apply the word "tenor" as construed in indictments and other cases of like nature, to the word "tenor" in the act of 1884, will not bear scrutiny.    Moreover, the town council eleven years ago issued these bonds. The people have paid interest upon them for eleven years, and, at the time when the new bonds were delivered, the town council received back the old bonds and canceled and burned them. It would certainly be an unheard of proposition that a town could exchange its old bonds for new ones, pay interest on them for eleven years, destroy the old bonds, and then come forward and defeat the new bonds because each bond of the new series was not exactly of the same amount as the old bonds.    This would be a new way to pay old debts.    The doctrine of estoppel, as set forth in the cases cited, is clearly applicable to this point.

The act of 1884 does not require either the bond or the coupon to be signed by the mayor or clerk, and it may be consid-

ered as a matter of common knowledge that coupons are never signed, but only lithographed signatures thereto are made. The signature to the bond itself is simply a matter of precaution for authentication, and no bond is ever issued with numbers of coupons attached, to which the signature is actually made by any officer. Lithographed copies or engraved copies of genuine signatures are all that is necessary, and that is the universal custom in issuing such bonds.

On the point about the date of the bonds, see *Woodruff* v. *Okolona*, 57 Miss., 806. In the case of *Dean* v. *Elarzada*, 24 Miss., 424, it was held that the date was the only part of the description of the note not necessary to its validity, and it might, therefore, be explained—a date can always be explained by parol evidence. "Date," Am. & Eng. Enc. L., 5; *Township of Rock Creek* v. *Strong*, 96 Sup. Ct., 271; *Commissioners of Marion County* v. *Clarke*, 94 U. S., 278.

The point is made that the bonds, instead of being made payable to the West & East Railroad Company, were made payable to bearer, and that they were therefore void. In the case of *Lombard* v. *City of Vicksburg*, 51 Miss., 111, the supreme court of Mississippi passes on this very question, and uses this language: "When, therefore, municipal bonds, bearing annual or semiannual interest, with long maturities, are authorized to be issued, it must be presumed that the legislature intended that they should conform to the known usage that they shall have that form and those incidents necessary to their availability. It is necessary that they should be negotiable, readily so, that purchasers and holders may acquire a legal title, divested of all equities that might exist between the original parties."

Argued orally by *E. F. Noel*, for appellant, and by *Murray F. Smith*, for appellee.

CALHOON, Special J., delivered the opinion of the court.

Under an act approved April 15, 1873, incorporating the West & East Railroad Company (Acts 1873, p. 479, secs. 19–

21), Lexington, by authority of the legal number of her qualified voters at an election, issued bonds to aid building the road, with coupons bearing 7 per cent. per annum, interest payable semiannually. The bonds were payable in five years, one-fifth each year on May 1, and were in denominations of $50, and were payable to bearer, and were delivered to the West & East Railroad Company. The railroad was built, but Lexington found it inconvenient to pay, and so a legislative act was procured, approved March 4, 1884, entitled ''An act to provide for the renewal and payment of the bonds of the city of Lexington, Mississippi '' (Acts, p. 745), which act authorized the city of Lexington to issue twenty-year bonds in renewal of the old, of '' like tenor,'' except they should bear date May 1, 1884, and that the coupons should be payable annually on May 1, and this act required '' the board of mayor and aldermen of said city '' to levy an annual tax to pay the interest, and, the last ten years, one-tenth the principal of the bonds.

Under this act, Lexington issued bonds to exchange for the old outstanding unpaid bonds, but issued them in denominations of $1,000 instead of $50, which was done by her municipal council without a new election, and with them she took up her old bonds, which were canceled and destroyed. She paid the interest on those new bonds for ten years or so, when she ceased to further liquidate, and appellee, a holder of some of the bonds, filed a petition for mandamus to compel her council to levy a tax to pay coupons, and an annual tax to pay one-tenth the bonds. To this petition Lexington filed an answer, paragraphed into nearly a score of pleas, and there were demurrers, replications, amendments, and so forth, which need not be followed seriatim but will be disposed of by the principles to be announced. The town council lost below, and appeals to this tribunal.

For reversal, it is urged that the town charter gives no authority to issue bonds, which is true in fact, and, then, it is argued that their issuance is unauthorized, as made by legisla-

tion. This is to be investigated, because, if true, and if there appears no estoppel, it settles this case for appellant.

The original act of 1873, before referred to, sec. 21, directs the old bonds and coupons to be signed by the mayor and attested by the clerk. In fact, the mayor did sign the old bonds, and the clerk did attest, but the coupons, while signed by the mayor, were not attested by the clerk. This is one contention.

Another contention is that the act of 1873 contemplated that these old bonds were to be made payable, not to bearer, as they are, but to the railroad company, because sec. 21 requires them to be " executed to " the railroad company, and signed as just mentioned, and " delivered to the president or treasurer " of the railroad company.

Another contention as to the old bonds arises out of averments of certain delusive promises unfulfilled about a depot and a bridge, etc., made to get votes for the donation.

We dispose of all these contentions about the old bonds with no sort of difficulty. They were not only recognized and treated as perfectly valid by the town, but by the legislature in the act of 1884, which authorized the substitution of new bonds for them. The town did substitute, got the old bonds and destroyed them, and is now endeavoring to repudiate the new.

But the contentions are baseless. The bonds, signed by the mayor and attested by the clerk, were issued with the coupons signed by the clerk, went into commercial exchange, and were annually recognized by the payment of coupons.

The authority to execute and deliver to the railroad company carried authority to issue negotiable bonds payable to bearer, as all such bonds are and ever have been, and the legislature must be presumed, without an express negative, to proceed on the uniform conduct of mankind in public enterprises of railroad construction. It is not supposable the legislative purpose was to nullify the object of aiding the railroad.

If flattering promises and demagogical arts and misrepresentations to voters vitiated elections, there would, perhaps, have

never been a valid election under our government. But the election in this case occurred fifteen years ago and more, during fourteen years of which time there has been no objection made to either bonds or coupons, old or new, and in the meantime the old bonds have been recognized as valid by the town and the legislature, and they have been redeemed by the new issue and canceled, in order that the town might extend time of payment from five to twenty years.

It is urged that the charter of Lexington creates two distinct corporations—one the town of Lexington and the other the town council—the first being the people and the other mayor and councilmen, and that there must be a vote for new bonds, in renewal of old, for railroad donations. This is a mistake. There is but one corporate town, Lexington, provided with a municipal head. Certainly the town—that is, the people, voted the donation. It could not print and issue bonds except by its officers. After contracting the debt, by a vote authorizing it, the people did not have to vote over again to pay it. If its authorities were not provided with funds to pay, the courts could compel a tax to pay, or the legislature might, as it did, authorize the substitution of new bonds, and thus give more time to pay, if the bondholders were willing.

It is insisted that the new bonds are void because the act of 1884 provides them to be of "like tenor" with the old ones. This is untenable. The words, of "like tenor," are to be taken in the sense that they are popularly understood, and not in the strict technical sense, as used in reference to the crimes of counterfeiting, forgery, libel, etc. They mean of the same nature or character. The statute was dealing with a financial transaction, and intended the word "tenor" in the popular, dictionary sense, not the precise sense of the criminal law.

The bonds—new and old—were a donation to the railroad company, given in lieu of cash, and to be used as cash. The new bonds did not add one cent to the liability imposed by the old, either of principal or interest. They were of the same

tenor—that is, of the same nature and character of the old, varying only in their denominational figures, and this to suit the convenience of the parties to the contract, as must be assumed. Even if there was any merit in this position, and there is not, it is not to be tolerated that the town should set up the defense, after exchanging the new for the old bonds, and destroying the old, and after recognizing the validity of the new for fourteen years by paying the coupons as they matured. It would be strange, indeed, if the municipal authorities of a city, its fiscal agency, could not provide for the renewal and extension of an old debt.

The bonds were lithographed as of date May 1, 1884, according to the terms of the act, but, not being delivered until November 7, 1884, the officers issuing them inserted the true date, which in no way affected the obligation of Lexington, the rights of any party, nor in any way violated the spirit or direction of the act, and so we declare the defense on this ground as of no avail, especially as the bonds recite that they are issued in pursuance of the act of 1884.

We repudiate as unsound the position that the unpaid coupons bore no interest after their maturity. The town being authorized to issue interest-bearing obligations maturing for payment at fixed dates, cannot avoid the continuance of interest without paying. Equally untenable is the position that the coupons have the signature of the clerk of the municipal council lithographed. This is not only a custom nearly, if not quite, universal, but they were issued by the town with that signature, and it would be a travesty of justice to permit a defeat of recovery on such a pretext. A lithographic signature to coupons has been often held to be sufficient, and it has been held that, as against a *bona fide* holder, the person whose name appears as officer will be presumed to have signed during his term of office. 15 Am. & Eng. Enc. L., 1226, 1227.

But, as to all such matters, and, in fact, as to nearly all the defenses set up by the town, long recognition of the validity of

the bonds and coupons amount to a ratification and estop it from repudiation, and waive such defenses.    The facts pleaded show the very acts of the town to be an estoppel, and to amount to a full waiver of any failure of the conditions of the subscription.

The fact that a national bank holds the bonds, even if by purchase, which is not the case, is of no use to appellant.    The United States only could ·complain.

We have not cumbered this opinion with the citation of authorities.    It would be mere affectation to do so.    The arguments of counsel on both sides are quite full, lucid, and strong, and our conclusion is reached from examining the authorities they produce and a few others.    We refer the bar to these briefs.

After careful and patient investigation this case is

*Affirmed.*