(83 N. W. Rep. 913.)

---

E. C. TOURTELOT, AS RECEIVER, *vs.* H. L. WHITHED, AS ASSIGNEE.

Opinion filed October 16, 1900.

**Appeal—Trial De Novo.**

This case being triable de novo in this court, the fact issues, on full consideration of the evidence, are resolved in favor of respondent.

**Insolvent Banks—Application of Deposits.**

Where, at the time a national bank was placed in the hands of a receiver, another corporation had on deposit therein a certain sum of money, and was also liable to the bank on distinct contracts, such other corporation had the right to direct the application of the money so on deposit.

**Authority of Bank President.**

Where the members of the board of directors of a bank have for months ceased to exercise the functions of their offices, and have abandoned the management and control of the corporation business entirely to the president of the bank, it will be presumed that such officer was authorized to do, in the name of the bank, whatever the bank might lawfully do, and no special authorization or ratification of his acts need be shown.

**Incidental Powers of Banking Corporations—Taking Corporate Stock in Payment of Debt to Bank.**

A contract by the terms of which a national bank receives corporate stock of another corporation in payment of a debt owing to the bank by such other corporation is not ultra vires as to the bank when, at the time of making the contract, such corporation is financially embarrassed, and unable to meet its commercial obligations as they mature. Such contract is directly incidental to the proper exercise of the powers for which the bank was chartered.

**Ultra Vires Contract When Performed May Not Be Declared Void at Suit of Either Party to it.**

A contract of a corporation that is ultra vires, not because prohibited by positive law, or inherently vicious, and not because the corporation could not, under any circumstances, make the contract, but solely because of the existing circumstances and conditions under which it was made, is never void, and the plea of ultra vires will not avail either party to such contract when the contract has been fully executed by the other party.

Appeal from District Court, Grand Forks County; *Fisk,* J.

Action by E. C. Tourtelot, receiver of the Grand Forks National Bank, against H. L. Whithed, assignee of the North Dakota Milling Company. Judgment for defendant, and plaintiff appeals.

Affirmed.

*Tracy R. Bangs,* for appellant.

Section 5136 and succeeding sections of the Revised Statutes constitute, with the acts since passed, a complete code of laws for the government of banking associations. *Logan County Bank* v. *Townsend,* 139 U. S. 67, 11 Sup. Ct. Rep. 496; *California National Bank* v. *Kennedy,* 167 U. S. 365, 17 Sup. Ct. Rep. 831, 42 L. Ed. 200. The dealing in stocks by national banks is entirely outside of the powers conferred upon these corporations and is not banking business. *California National Bank* v. *Kennedy,* 167 U. S. 362; *Bank* v. *Hart,* 38 Neb. 666, 26 L. R. A. 780. Such transactions in stocks of other corporations are void and *ultra vires.* Morowetz, Corp. § 433; Thompson, Corp. § 5719; *Franklin County* v. *Lewiston,* 28 Am. Rep. 9; *Buckeye Marble Co.* v. *Harvey,* 19 L. R. A. 252, n., 20 S. W. Rep. 427; *Miller* v. *Ins. Co.,* 20 L. R. A. 765, 21 S. W. Rep. 39; *Franklin Bank* v. *Commercial Bank,* 36 Ohio St. 350, 38 Am. Rep. 594; *Hotel Co.* v. *Schran,* 32 Pac. Rep. 1002; *German Bank* v. *Wulfekuhler,* 19 Kan. 60; *Knowles* v. *Sandercock,* 40 Pac. Rep. 1047; *Central Ry. Co.* v. *Pennsylvania Co.,* 31 N. J. Eq. 475; *Barry* v. *Yates,* 24 Barb. 199; *Valley Co.* v. *Iron Works,* 46 Ohio St. 40, 18 N. E. Rep. 486; *Easum* v. *Buckeye,* 51 Fed. Rep. 156; *People* v. *Gas Trust,* 130 Ill. 268, 22 N. E. Rep. 798; *Milbank* v. *Ry. Co.,* 64 How. Prac. 20. A contract which is *ultra vires* as being beyond the powers conferred upon it by the legislature is not voidable only, but wholly void. *Miller* v. *Mutual Accident Ins. Co.,* 20 L. R. A. 769; *Central Transportation Co.* v. *Pullman Car Co.,* 139 U. S. 59, 35 L. Ed. 68; *McCormick* v. *National Bank,* 165 U. S. 550, 41 L. Ed. 821. In dealing with corporations all persons are bound to take notice, at their peril, of the extent of the powers of such corporation. Reese, Ultra Vires, § 53; *Franklin* v. *Sav. Inst.,* 68 Me. 43, 28 Am. Rep. 9; *Kraniger* v. *Building Society,* 60 Minn. 94, 61 N. W. Rep. 904; *Hayden* v. *Fire Ass'n.,* 80 Va. 683; *Bailey* v. *Gas Co.,* 27 N. J. Eq. 196. The contract, by means of which the bank became possessed of this stock, and under which it surrendered the promissory notes of the milling company, was void. It was the duty of the bank to disaffirm the contract, and it became the duty of the bank's receiver to disaffirm the stock trafficing transaction and to sue for a restoration of its original property rights. *Thomas* v. *Ry. Co.,* 101 U. S. 71; *Miller* v. *Ins. Co.,* 20 L. R. A. 765; *Railroad Co.* v. *Bridge Co.,* 131 U. S. 389; *Central Transportation Co.* v. *Pullman Car Co.,* 139 U. S. 60; *Parkersburg* v. *Brown,* 106 U. S. 487, 27 L. Ed. 245; *Pratt* v. *Short,* 79 N. Y. 437; *Ohio Life Ins. Co.* v. *Trust Co.,* 11 Humph. 1; *Gas Light Co.* v. *Gas Co.,* 85 Me. 541; *Miller* v. *Ins. Co.,* 20 L. R. A. 765; *Greenville* v. *Compass Planters Press,* 35 Am. St. Rep. 683, n.; Reese, Ultra Vires, § 74; *Twiss* v. *Loan Ass'n.,* 87 Ia. 733; *Day* v. *Buggy Co.,* 57 Mich. 146; *Anthony* v. *Sewing Machine Co.,* 5 L. R. A. 575.

*Templeton & Rex,* for respondent.

The stock of the milling company was not received by the bank as security but in payment of the debt, and having been so re-

ceived by the bank the transaction was not *ultra vires.* The bank had the right to become the owner of the stock in payment of a debt, though it may not have had the right to purchase the stock as an original investment of its funds. *First National Bank* v. *National Exchange Bank,* 92 U. S. 122, 23 L. Ed. 679; *Germania National Bank* v. *Case,* 99 U. S. 620, 25 L. Ed. 448; *People* v. *Gas Trust,* 130 Ill. 268-283; *Deposit Bank of Owensborough* v. *Barrett,* 13 S. W. Rep. 337; Thomp. Corp § 5719; *Howe* v. *Boston Carpet Co.,* 16 Gray 493; *Miners Ditch Co.* v. *Zellerbach,* 37 Cal. 543; *Holmes & Griggs Mfg. Co.* v. *Holmes, Etc. Co.,* 127 N. Y. 252; *Ellerman* v. *Chicago Junction Ry. Co.,* 49 N. J. Eq. 217-250, 23 Atl. Rep. 287-299. No action of the board of directors of the bank was necessary to empower Booker, as president, to accept the stock in payment of the milling company's debt. The directors had ceased to exercise any management or control over its affairs and had abandoned the entire management and control to Booker, the president. Under such circumstances Booker was in legal contemplation, the corporation, the bank, and had the same powers that the directors themselves had. *Washington Savings Bank* v. *Butchers' and Drovers' Bank,* 17 S. W. Rep. 644; *Kraniger* v. *People,* 60 Minn. 94, 61 N. W. Rep. 904; *Simons* v. *Fisher,* 55 Fed. Rep. 905; *U. S. Bank* v. *First National Bank,* 79 Fed. Rep. 296; *State National Bank* v. *Chemical National Bank,* 80 Fed. Rep. 859; *Cocks* v. *Robinson,* 82 Fed. Rep. 277-283.

*Cochrane & Corliss,* for respondent.

That a national bank may take stock in payment of or security for indebtedness is well settled. *Fleckner* v. *Bank,* 8 Wheat. 351; *Bank* v. *Bank,* 92 U. S. 122; *Boyd* v. *Bank,* 22 Am. Rep. 35; 1 Morse, Bank'g, § § 60, 77 and 78; *Bank* v. *Bank,* 51 How. Prac. 320; *Howe* v. *Boston Carpet Co.,* 16 Gray, 493; *McCraitt* v. *Bank,* 10 N. E. Rep. 862; *Bank* v. *Bank,* 39 Md. 611; *H. & G. M. Co.* v. *Co.,* 127 N. Y. 252, 3 Am. & Eng Enc. L (2d Ed.) 798, 799; *Anderson* v. *Bank,* 5 N. D. 451, 454. The evidence shows that before the transaction in question took place the directors of the bank had utterly abandoned the affairs of the bank and left all of its affairs in the exclusive charge of Booker, its president. Under such circumstances Booker was, for all purposes, the board of directors and had the power which the board had, and therefore which the corporation itself possessed. *Wing* v. *Bank,* 61 N. W. Rep. 1009, 1013; *Davenport* v. *Stone,* 62 N. W. Rep. 723; *Martin* v. *Webb,* 110 U. S. 7; *Armstrong* v. *Bank,* 83 Fed. Rep. 571; 1 Morse, Bank'g, § 343. In view of the conflict of authority and of the qualified doctrine established by some of the courts permitting a corporation to purchase its own stock under certain conditions, and of the fact that other courts deny the power altogether, (see note 33 Am. St. Rep. 399, 345), it is obvious that § 2880, Rev. Codes of this state was framed for the express purpose of fixing the exact limits of such corporate power in this jurisdiction. *Adams, Etc. Co.*

v. *Deydette,* 59 Am. St. Rep. 751, 756. If a corporation may buy its own stock, or make a valid agreement to buy it, in this indirect way, its stock may be diminished and destroyed and the policy of the statute which is protection to the public, be entirely defeated. *Trevor* v. *Whitworth,* 12 App. Cas. 409; 2 Thomp. Corp. § 5024; *Coppin* v. *Greenless,* 38 Ohio St. 275. The statute guards against the distribution of capital stock among the stockholders. § 2891, Rev. Codes. And yet this is precisely what is done when stockholders are allowed to sell their stock to the corporation. The agreement on the part of the company to buy back its own stock was therefore *ultra vires,* and being executory no claim for damages, based thereon, can possibly exist. *Adams, Etc. Co.* v. *Deydette,* 59 Am. St. Rep. 754. The capital stock of a corporation is a trust fund. 2 Thomp. Corp. § 1569; *Hamor* v. *Taylor,* 84 Fed. Rep. 395; *Sawyer* v. *Hoag,* 17 Wall. 610. Therefore, if a stockholder may, by a secret agreement with the corporation, place himself in a position where, in the event the corporation becomes insolvent, he may become a creditor of the corporation and cease to be a stockholder therein, all of the stockholders may make such an agreement and upon the insolvency of the corporation the creditors instead of having a corporate stock as assets out of which to collect their claims would find the stockholders to be creditors of the corporation. Agreements to transmute stockholders into creditors can not be enforced at the expense of other creditors. *Adams, Etc. Co.* v. *Deydette,* 59 Am. St. Rep. 751; *Buck* v. *Ross,* 57 Am. St. Rep. 60; *Heggie* v. *Peoples,* 107 N. C. 581; *Bent* v. *Hart,* 10 Mo. App. 143; *Fraser* v. *Ritchie,* 8 Ill. App. 554; *Clapp* v. *Peterson,* 104 Ill. App. 26; *Bank* v. *Burch,* 33 Am. St. Rep. 331; *Hamor* v. *Taylor,* 84 Fed. Rep. 393; *Atwater* v. *Stromberg,* 77 N. W. Rep. 963; *Atwater* v. *Smith,* 76 N. W. Rep. 253; *Columbian Bank's Estate,* 147 Pa. St. 422; *Buck* v. *Ross,* 57 Am. St. Rep. 60; *Wilbur* v. *Stoepel,* 46 N. W. Rep. 724. It is not important to show that there was any design to defraud, however innocent the transaction may be, if the effect of the sale or of enforcing the sale is to prejudice creditors, the sale is illegal. *Clapp* v. *Peterson,* 104 Ill. 26; *Bank* v. *Burch,* 33 Am. St. Rep. 334. After the bank had purchased the stock it was no longer the creditor of the company, but was a stockholder therein. *Yeaton* v. *Eagle, Etc. Co.,* 29 Pac. Rep. 1051.

BARTHOLOMEW, C. J. In the year 1888 the Grand Forks National Bank was duly organized, and commenced business as such national bank at the city of Grand Forks, in this state. In 1896 said bank became insolvent, and the comptroller of currency took possession of its assets, and on August 6th of said year E. C. Tourtelot, the plaintiff and appellant herein, was placed in charge of the assets of said bank as receiver, and it is in that capacity that he brings this action. Some time prior to the year 1891 the North Dakota Milling Company was duly organized as a corporation under the laws of this state. In April, 1897, the said milling company made a general assignment for the benefit of creditors to the defendant and respondent, H. L.

Whithed. This action was brought to compel the allowance and the pro rata payment by the assignee of alleged claims held by the said bank against the said milling company, aggregating $14,000, and the accrued interest thereon. These claims were presented to the said assignee, and were by him disallowed except in the sum of $2,985.83. This action of the assignee was sustained by the trial court, and the plaintiff appeals.

In 1891 the milling company borrowed from said bank the sum of $10,000, giving its promissory notes therefor. These notes were renewed from time to time. Subsequent loans were also obtained at the bank. The milling company at one time was indebted to the bank in the sum of $20,000. By means obtained from a loan made elsewhere the milling company reduced this sum to $14,000. The complaint alleges that on September 4, 1894, the milling company executed and delivered to the bank its two promissory notes for $2,500 each, due December 1, 1894, and that on October 9, 1894, it executed and delivered to the bank its further promissory note for the sum of $5,000, due Deecmber 9, 1894. It is conceded that these notes were renewals of the pre-existing indebtedness. There was also another note of $4,000. As to the three notes first above mentioned, and aggregating the sum of $10,000, it is the contention of respondent that the indebtedness thus represented was paid and discharged on November 4, 1894, by the sale and transfer to the bank of preferred stock in the milling company in the amount of $10,000. The appellant admits that this stock was received by the bank, but contends that it was received as collateral security for said indebtedness, and not in satisfaction thereof. This is the first question of fact upon which this court must pass. As to the other note of $4,000, which was executed October 29, 1895, and payable on demand, the liability thereon is not disputed, but the respondent seeks to set off against such liability the sum of $1,014.17, which the milling company had on deposit in the bank at the time it went into the hands of the receiver. The appellant contends that such sum was not on deposit, for the reason that by the memorandum check of its cashier, and with the knowledge and consent of the milling company, the bank had appropriated $1,000 of such sum in payment of the interest of the $10,000 indebtedness, or of dividends upon the preferred stock. The respondent insists that the milling company never assented to such appropriation, but, on the contrary, expressly repudiated and rejected the same. This raises the second question of fact for our determination.

Some further statement of facts and reference to the evidence will be necessary to explain our conclusion. The capital stock of the milling company was originally $100,000. It had more money invested in its plants than the amount of its capital stock. This excess was borrowed money, upon which it was paying, so far as the record shows, 10 per cent. interest. The sum thus borrowed was $55,000. Its business in the fall of 1894 was not prosperous. It could not meet its demands as they matured, and it desired to get

cheaper money. In view of these facts the officers of the milling company conceived the plan of improving the credit of the company by increasing the capital stock by the issuance of $55,000 of preferred stock, and the exchange thereof for such indebtedness for borrowed money. The reasons for this action are thus stated by the president of the company in his testimony in this case: "The company had more money invested in different plants than its capital amounted to, and could not, therefore, pay their obligations without selling some of their property that was necessary to have to operate; and it was essential that they have more money in capital. They had borrowed money,—I think about $55,000,—and they could not pay it. If they paid it, they would have had to quit business, and it came to a point where it was advisable to make it capital stock instead of bills payable, because they could not pay it and continue business." The preferred stock was issued, and a certificate for 100 shares of $100 each was delivered to the bank. Among the indorsements on said certificate was the following: "That the holders of preferred stock shall be entitled to priority of dividends at the rate of eight per cent. per annum, to be paid from the earnings of the company; such dividends to be cumulative, and no dividends to be paid on the common stock until all dividends on the preferred stock, past and current, shall have been fully paid." When the certificate of stock was delivered to the bank, there was also delivered the written agreement known in this case as "Exhibit 1," and which reads as follows: "This agreement witnesseth that whereas, the Grand Forks National Bank has purchased one hundred shares of the preferred stock of the North Dakota Milling Company, par value $10,000, and paid therefor by canceling and delivering to said North Dakota Milling Company its notes for $10,000 which have been held by said bank: Now, in consideration of the aforesaid, said North Dakota Milling Company agrees with said Grand Forks National Bank that the dividend on said stock shall equal ten per cent. per annum while held by said bank; and said milling company further agrees to find a purchaser for said stock on or before November 1st, 1895, and with the proceeds of said sale pay to said bank the sum of $10,000 and accrued dividends at the rate of ten per cent. per annum, in exchange for said preferred stock. In witness whereof said milling company has hereunto set its hand and seal of the corporation this third day of November, 1894. North Dakota Milling Co., by George B. Clifford, Prest. E. Mapes, Sec. (Seal.)" At the same time the three notes aggregating $10,000 were delivered by the bank to the milling company, and the account of "bills receivable" on the books of the bank was credited with $10,000, and the account of "stocks, claims, and securities" was charged with $10,000. The managing officers of both corporations concede that the contract above quoted correctly states the agreement between the parties, but they differ as to the real meaning of the contract. The appellant, on the theory, we presume, that the contract was ambiguous, introduced the testimony of the president of the bank, under objection as to its competency,

showing certain conversations that preceded the making of the contract, as bearing upon its meaning, and as to what the parties intended. Under. elemetry principles, such evidence was incompetent. The contract is neither ambiguous nor uncertain as to its terms. The contract in terms declares that the bank "has purchased one hundred shares of the preferred stock," etc., and has "paid therefor by canceling and delivering to said North Dakota Milling Company its notes for $10,000, which have been held by said bank." The absolute extinguishment of the debt represented by the notes in payment of the purchase price of the stock could not be more emphatically asserted. Nor are.we at all clear that the president of the bank intended to state otherwise. It is clear that he well knew that one of the objects of the milling company in issuing the preferred stock was to enable it to make a statement to Eastern capitalists that would show a reduced floating indebtedness. If he supposed that the indebtedness should continue in fact, but disappear from the statement, then he at once became a party to a fraud. Such was not his intention. The remainder of the contract shows what he meant by saying in effect that the relations of the parties were not changed by the transaction. The ultimate outcome was not affected. It never was the intention that the bank should hold the stock as a permanent investment. The milling company agreed to pay an annual dividend of 10 per cent. on the stock, and to find a purchaser for the stock within a year, and pay the bank $10,000, not on the old debt, but "in exchange for said preferred stock." Thus the bank would receive its money and 10 per cent. interest thereon. But the old indebtedness was gone, and in lieu thereof the bank was the owner of the stock, with a virtual contract to repurchase at its face value on the part of the milling company. There would be no liability upon that contract until a breach thereof. But neither the liability upon that contract nor its legality is in any manner involved in this case. Appellant seeks to establish the old indebtedness as represented by the canceled notes. If the contract already set forth was a valid contract, that debt was extinguished, and the trial court rightly so held.

We are equally clear that the trial court was correct in holding that the deposit of the milling company in the bank at the time it went into the hands of the receiver had never been paid, in whole or in part, to the milling company or its assignee. Of course, an appropriation of the money in payment of a debt of the milling company with the consent of such company, would have been a payment to it. There is, to some extent, a conflict in the testimony on this point. No benefit would accrue from its discussion. We are all agreed that the trial court correctly ruled.

But, conceding that by the stock transaction contract already discussed it was intended to extinguish the original indebtedness to the extent there specified, and that the bank should actually purchase the stock, appellant contends that such stock contract on the part of the bank was ultra vires and void, and that it is his duty to

proceed as if such contract had never been made, and such notes never canceled. This is the difficult question in the case. A preliminary point is made to the effect that the purchase of corporate stock is not within the ordinary powers and duties of bank officers, and hence not valid, unless authorized or ratified by the board of directors; and no such authorization or ratification has ever taken place. To this respondent replies that the transaction was at once spread upon the books of the bank, where the directors were bound to take notice of it, and their long acquiescence amounts to a ratification. We pass this without a ruling, as we prefer to rest our decision of the point upon the second position taken by respondent. It is undisputed that when that contract was made, and for months prior thereto, the members of the board of directors of said bank had ceased to exercise the functions of their offices, or to take part in the management of the affairs of the bank. The whole control and management of its affairs was then, and for months had been, in the hands of the president. It was by and through him that this stock contract was made. Where the entire control of the affairs of the corporation has been thus abandoned to one of its officers, it will be presumed that he is authorized by the corporation to do any act that the corporation might lawfully do, and the acts of such officer in transacting the business of the corporation need no authorization or ratification from a nominal board of directors. *Cox* v. *Robinson,* 27 C. C. A. 120, 82 Fed. Rep. 277; *Washington Sav. Bank* v. *Butchers' & Drovers' Bank,* 107 Mo. 134, 17 S. W. Rep. 644; *Kraniger* v. *Society,* 60 Minn. 94, 61 N. W. Rep. 904; *Martin* v. *Webb,* 110 U. S. 7, 3 Sup. Ct. Rep. 428, 28 L. Ed. 49; *Calvert* v. *Stage Co.,* 25 Ore. 412, 36 Pac. Rep. 24; *Ceeder* v. *Lumber Co.,* 86 Mich. 541, 49 N. W. Rep. 575; Thomp. Corp. § 4883. We think the bank was bound if the contract was not *ultra vires.*

In connection with the validity of the contract appellant makes a vigorous assault upon the ninth finding of the trial court, which reads: "That on said 3d day of November, 1894, said North Dakota Milling Company was financially embarrassed, and unable to meet its obligations." The reason for this assault lies in the fact that appellant concedes that the powers of a bank in adjusting disputed or doubtful claims are much broader than in adjusting claims that are undisputed in amount and certain of collection. In this case the amount of the original indebtedness was undisputed, and appellant insists that its collection was not doubtful. It is true that in the financial statement prepared by the officers of the milling company, after preferred stock to the amount of $55,000 had been issued, and a corresponding amount of bills payable retired therewith, showed assests equal to liabilities, including the $155,000 capital stock. But such statement showed outstanding bills payable and book accounts amounting to $79,460.53, while its bills receivable and book accounts in its favor and cash on hand amounted to only $40,205.04. The column of assets was also swelled by the item of profit and loss to the extent of $42,823.60. But, granting that the assets of the milling

company were ample to meet all its obligations aside from liability to stockholders, the fact yet remains that it was insolvent in the sense that it then was, and for some time had been, unable to meet its commercial obligations as they matured. This, under the evidence, cannot be questioned. It is shown that for some time after its creation the milling company was a very profitable concern. Later the profits became less, and finally business was done at a loss. Doubtless those interested believed that by obtaining money for present necessities the concern could be restored to a basis of profit. The fact that a 10 per cent. dividend was guarantied by one party, and that the guaranty was accepted by the other party, shows that such was the expectation. But that did not change the fact that the milling company was at that time financially embarrassed, and unable to meet its obligations, and any attempt to enforce a large claim against it would necessarily disappoint such expectations, and at once force an assignment. It must be remembered that the bank had been carrying that loan on short-time renewals for more than three years. The stringent times of which counsel for appellant speaks had arrived, and, as he says, the bank was "struggling for existence;" in other words, making every effort to convert its assets into cash. Yet it had just renewed those notes for 60 and 90 days. Counsel says "voluntarily," as showing the solvency of the milling company. Is it not much fairer, in view of the testimony, to say that they were renewed because the president could not see his way clear to collect them, and did not wish to carry overdue paper among the assets of the bank? In measuring the power of the bank, or, what is the same thing in this case, the power of the president to deal with this claim, we think it should be viewed in this light. It would be to the advantage of the bank if its debtor could be again placed upon a money-earning basis, and, if this could be done by delivering up the notes, and taking in their stead property from which it would ultimately realize the same amount of money that it would receive were the notes paid in full, then clearly it was to the interest of the bank to do so. The transaction was an absolute purchase, under the conditions stated, by the bank, of the preferred corporate stock, and the consideration paid therefor the extinguishment of the debt of the milling company to the extent of $10,000. Was the contract *ultra vires?* Section 5201, Rev. St. U. S., prohibits a national bank from making any loan or discount on the shares of its own stock except under certain specified and stringent conditions. Counsel argues from this that it was the purpose of Congress to inhibit the purchasing or holding by national banks of corporate stocks except under the conditions named. We do not think this inference necessary. There are objections to permitting a corporation to purchase or hold its own stock that do not apply to stock of other corporations. The capital stock is a trust fund, to which creditors may always look with confidence. The law will not sanction any impairment of that fund. In speaking of the purchase by a corporation of shares of its own stock, it is said in Morawetz

on Corporations (volume 1, § 112): "There is no substitution of membership under these circumstances, as in case of a purchase and transfer of shares to a third person, but the members of the company and the amount of its capital are actually diminished. Whatever a transaction of this character · may be called in legal phraseology, it is clear that it really involves an alteration of the. company's constitution, just as the withdrawal of a member of a co-partnership with his proportionate share of the joint funds involves an alteration of the constitution of a co-partnership. The amount of the company's assets and the number of its shareholders are diminished. Every continuing shareholder is injured by the reduction of the fund contributed for the common venture; and the creditors who have trusted the company upon the security of the capital originally subscribed, or who are entitled to expect that amount of security, are entitled to complain." But no such results follow the purchase of the stock of any other corporation, and the analogy claimed by counsel cannot be sustained. See *Adams & Westlake Co.* v. *Deyette,* 8 S. D. 119, 65 N. W. 471, 31 L. R. A. 497. Much reliance is placed by appellant upon the case of *Bank* v. *Kennedy,* 167 U. S. 362, 17 Sup. Ct. Rep. 831, 42 L. Ed. 198. That appears to have been a case where the officers of a national bank proceeded to organize a savings bank. All the stock of such savings bank was issued to such officers of the national bank or to the bank. The savings bank failed, and in an action against it by a creditor the national bank was made a party defendant, as being liable, under the California statute, for a share of the indebtedness in proportion to the amount of stock of the savings bank held by it. The · court held, upon what would seem to be clear provisions of elementary law, that the national bank as such had no power to take or hold the savings bank stock under the circumstances stated. It was not taken as security for an indebtedness, or in payment of an indebtedness, or in any manner directly or incidently connected with the transacting of banking business, for which alone the national bank was organized. It was simply a speculative investment. This is made clear by the language of Mr. Justice White, who wrote the opinion of the court. He says: "The circumstance that the dealing in stocks by which, if at all, the stock of the California Savings Bank was put in the name of the California National Bank, was one entirely outside of the powers conferred upon the bank, and was in no wise the transaction of banking business, or incidental to the exercise of the powers conferred upon the bank, distinguishes this case from the class of cases relied upon by the defendant in error." The propriety of permitting the national bank to retain the shares of stock of the savings bank, and the dividends that it had received thereon, and at the same time repudiate its liability as a stockholder, seems not to have been discussed or considered in the case; the court contenting itself with the distinction that, as the act of the national bank in receiving the stock was absolutely void, no estoppel could be based thereon. The case of *Bank* v. *Hart,* 37 Neb. 197,

55 N. W. Rep. 631, 20 L. R. A. 780, is not really different in principle from the last case. There the bank cashier purchased stock in an insurance company; and agreed to credit the purchase price on a note held by the bank against the vendor. It was held that the act was beyond the scope of the powers of the cashier, and could not be ratified by the board of directors. It does not appear .that the note upon which the credit was to be made was mature, or that the maker was not abundantly able to meet it when due. It appears simply as a voluntary investment for speculative purposes. The court in this opinion says: "An emergency might arise when a bank's board of driectors would be justified in taking the stock of another corporation in settlement, adjustment, or compromise of a doubtful claim or debt, acting in the honest belief that only by so doing could a serious loss to the bank be averted." Neither of these cases necessarily requires a reversal of this case.

The real point in controversy, as we conceive it, is this: Had the Grand Forks National Bank power to receive the stock of the milling company in payment of a pre-existing debt, the bank at. the time honestly and reasonably supposing that it could realize the money owing to it more quickly and more certainly by the course than by attempting to enforce the original debt? And this is perhaps but another form of asking: Was the transaction named properly incident to the due prosecution of the banking business? The case of *First Nat. Bank of Charlotte* v. *National Exch. Bank,* 92 U. S. 122, 23 L. Ed. 679, is instructive. The point decided is thus stated by Mr. Chief Justice Waite: "The question presented for our consideration in this case is whether a national bank organized under the national banking act may, in a fair and bona fide compromise of a contested claim against it, growing out of a legitimate banking transaction, pay a larger sum than would have been exacted in satisfaction of the demand, so as to obtain by the arrangement a transfer of certain stocks in railroad and other corporations ,it being honestly believed at the time that by turning the stocks into money under more favorable circumstances than then existed a loss, which would otherwise accrue from the transaction, might be averted or diminished." In the course of the opinion it is said: "Dealing in stocks is not expressly prohibited, but such a prohibition is implied from the failure to grant the power. In the honest exercise of the power to compromise a doubtful debt owing to a bank, it can hardly be doubted that stocks may be accepted in payment and satisfaction, with a view to their subsequent sale or conversion into money, so as to make good or reduce an anticipated loss. Such a transaction would not amount to a dealing in stocks. It was, in effect, so decided in *Fleckner* v. *Bank,* 8 Wheat. 351, 5 L. Ed. 631, where it was held that a prohibition against trading and dealing was nothing more than a prohibition against engaging in the ordinary business of buying and selling for profit, and did not include purchases resulting from ordinary banking transactions. For this reason, among others, the acceptance of an indorsed note in payment of a debt

due was decided not to be a 'dealing' in notes. Of course, all such transactions must be compromises in good faith, and not mere cloaks or devices to cover unauthorized practices." In *Holmes & Griggs Mfg. Co.* v. *Holmes & Wessell Metal Co.,* 127 N. Y. 252, 27 N. E. Rep. 831, it is said: "It is doubtless true that a corporation cannot purchase or deal in stocks of another corporation unless expressly authorized by law so to do;" citing cases. "It is equally true, however, that it may do whatever may be necessary in the exercise of its corporate franchise. The selling of property and the collection of debts are among the powers given; and hence it may take title to all kinds of property, even the stock of another company, in payment of a debt." In *People* v. *Chicago Gas Trust Co.,* 130 Ill. 268, 22 N. E. Rep. 798, the court condemns the purchase by one gas company of the stock of another gas company, and places the ruling upon the specific ground that such purchase was not directly appropriate to the execution of the specific power granted. But the court in terms concedes the right of the purchasing company to receive such stock in payment of a debt. See, further, *Ditch Co.* v. *Zellerbach,* 37 Cal. 543; *Howe* v. *Carpet Co.,* 82 Mass. 493; *Ellerman* v. *Stock-Yards Co.,* 49 N. J. Eq. 217, 23 Atl. Rep. 287; Thomp. Corp. § 5719; Mor. Priv. Corp. § § 648, 649, 700, 705. These authorities, we think, clearly establish the principle that any act done by a corporation which is directly incidental to the proper exercise of its franchises cannot be *ultra vires.* The bank had the undoubted power to collect the debt owing to it, and in the exercise of that right it had the incidental power to exchange the debt for property from which it honestly and reasonably supposed it could more certainly realize the money. We have already held that the bank made the exchange for those reasons. The fact, if it be a fact, that the sequel showed such exchange to be disastrous to the bank could not affect the original power to make the exchange.

But we desire to place our ruling also upon another ground. We may concede that the contract of the bank to exchange the debt for the milling stock was *ultra vires,* and yet we cannot reverse this judgment. We notice first that this contract has been fully consummated upon both sides. The stock has been delivered with intent therewith to pay the debt. The stock has been accepted, and the evidences of indebtedness delivered to the debtor, with intent thereby to extinguish the debt. It is an executed contract, and one, as we shall see, wherein the law will leave the parties where it finds them. The authorities upon this subject are in confusion, and, unless carefully analyzed, may be deemed contradictory. The term "ultra vires" has been used without accurate discrimination. Certain contracts on the part of corporations may be prohibited by positive law, either statutory or common. Where such contracts are made by corporations, they are, of course, unlawful. They are *mala prohibita,* and void, for the same reason that the prohibited contract of an individual would be void. Yet courts have termed them *ultra vires,* and have then proceeded to say that *ultra vires* contracts were void,

and might be disregarded at pleasure. More properly speaking, *ultra vires* contracts of a corporation are such as do not in any manner serve the accomplishment of the purposes for which the corporation is chartered. They are contracts not positively forbidden, but impliedly forbidden, because not expressly or impliedly authorized. Mr. Zane, in his late and valuable work on Banks and Banking, at page 61 et seq., is inclined to draw the line just here, and say that all so-called *ultra vires* contracts that are made in violation of positive law are·void, while all *ultra vires* contracts that are in excess of granted powers are voidable merely, and voidable only prior to completed execution. We are not required to go so far in this case. Perhaps we are not prepared to go quite so far, but where a contract is *ultra vires*, not because the corporation may not make it under any circumstances, but by reason of the particular circumstances under which it is made, then it is never void, and the plea of *ultra vires* cannot be made by either party after the contract has been executed by the other party. The case under consideration well illustrates our meaning. If the contract in question be *ultra vires*, it is not because it is prohibited by positive law, or because it is a contract that the bank could not make under any circumstances. It is conceded that the bank might take the corporate stock as collateral security for a present loan, and in order to collect the loan it might sell the collateral, and become the purchaser and legal owner thereof. It is also conceded that the bank might, in the language of counsel, "take such stock in compromise of a doubtful or contested claim, where to do so would prevent a possible loss. If *ultra vires*, it was because of the circumtsances under which it was made, and, as already stated, the plea of *ultra vires* will not avail. We enforced this principle in the recent case of *Clarke* v. *Olson,* 9 N. D. 364, 83 N. W. Rep. 519. We rested the decision there upon a quotation, with authorities cited, from *Lewis* v. *Association,* 98 Wis. 203, 73 N. W. Rep. 793, 39 L. R. A. 559. But, as the proposition is vigorously assailed in this case, it may be well to examine the authorities further. We first cite the cases relied upon by appellant, some of which, it may be conceded, fully support his contention. The first is *Central Transp. Co.* v. *Pullman's Palace-Car Co.* 139 U. S. 24, 11 Sup. Ct. Rep. 478, 35 L. Ed. 55. The holding in that case is in no manner in conflict with our ruling. The court there held the contract void because it was one that the corporation could not make under any circumstances. From the case of *Miller* v. *Insurance Co.* (Tenn. Sup.) 21 S. W. Rep. 39, 20 L. R. A. 765, which is a Tennessee case, and the authorities therein cited, it would appear that all *ultra vires* contracts are held void in that state. *McCormick* v. *Bank,* 165 U. S. 538, 17 Sup. Ct. Rep. 433, 41 L. Ed. 817, was a suit on a contract made by the bank at a time when it had no authority to contract. The contract was held void. See, also, *Franklin Co.* v. *Lewiston Institution for Savings,* 68 Me. 43; *Bailey* v. *Gaslight Co.,* 27 N. J. Eq. 196; *Thomas* v. *Railroad Co.,* 101 U. S. 71, 25 L. Ed. 950. But, as fully sustaining

our views as herein before expressed, we call attention to the cases cited in the extended notes to *Central Transp. Co.* v. *Pullman's Palace-Car Co.,* as reported in 35 L. Ed. 55, and also notes to *Miller* v. *Insurance Co.,* supra, and cite also *Arms Co.* v. *Barlow,* 63 N. Y. 62; *Parish* v. *Wheeler,* 22 N. Y. 496; *Navigation Co.* v. *Weed,* 17 Barb. 378; *Darst* v. *Gale,* 83 Ill. 136; *Carson City Sav. Bank* v. *Carson City Elev. Co.,* 90 Mich. 550, 51 N. W. Rep. 641; *Holmes & Griggs Mfg. Co.* v. *Holmes & Wessell Metal Co.,* 127 N. Y. 260, 27 N. E. Rep. 831; *Raft Co.* v. *Roach,* 97 N. Y. 378; *State Board of Agriculture* v. *Citizens' St. Ry. Co.,* 47 Ind. 407; *Oil Creek & A. R. R. Co.* v. *Penn. Transp. Co.,* 83 Pa. St. 160; *Ditch Co.* v. *Zellerbach,* 37 Cal. 543; *Bank* v. *Case,* 99 U. S. 627, 25 L. Ed. 448; *Bank* v. *Matthews,* 98 U. S. 621, 25 L. Ed. 188; *Kadish* v. *Ass'n.,* 151 Ill. 531, 38 N. E. Rep. 236; *Anderson* v. *Bank,* 5 N. D. 451, 67 N. W. Rep. 821; *Sioux Falls Nat. Bank* v. *First Nat. Bank,* 6 Dak. 113, 50 N. W. Rep. 829; *Tootle* v. *Bank,* 6 Wash. 181, 33 Pac. Rep. 345; *Volts* v. *Bank,* 158 Ill. 532, 42 N. E. Rep. 69; *Bank* v. *Porter,* 52 Mo. App. 244; *Town of Lexington* v. *Union Nat. Bank,* 75 Miss. 1, 22 South. Rep. 291; *Cameron* v. *Bank* (Tex. Civ. App.) 34 S. W. Rep. 178. The judgment of the District Court of Grand Forks county in this case is in all things affirmed. All concur.