[No. 12334.    Department Two.    October 8, 1915.]

FIRST NATIONAL BANK OF KENNEWICK, *Appellant*, v.
CHARLES CONWAY *et al.*, *Respondents*.[1]

APPEAL—REVIEW—FINDINGS. The finding of a jury upon conflict-
ing evidence is conclusive upon appeal.

FRAUDS, STATUTE OF—CONTRACTS—SALE OF REAL ESTATE. Execu-
tory contracts for the sale of land, required to be in writing, are not
specialties, but simple contracts, valid when signed without the for-
malities required for the execution of deeds.

EVIDENCE—PAROL EVIDENCE TO VARY WRITING—REAL PARTY IN IN-
TEREST—PRINCIPAL AND AGENT—FACT OF AGENCY. Parol evidence is
admissible to show that an executory contract for the sale of land
in the name of the vice president of a bank as purchaser was taken
by him as agent for the bank, and that the bank was liable thereon
as the real party in interest.

BANKS AND BANKING—NATIONAL BANKS—POWER TO TAKE REAL
ESTATE. Having made an improvident loan to a brick manufactur-
ing company, a national bank has power to purchase and take title
to the real estate upon which the brick plant was situated, in order
to save itself from apprehended loss; under U. S. Rev. St., § 5137, so
expressly providing.

SAME—OFFICERS—CASHIER—POWERS—APPARENT AUTHORITY. The
cashier of a national bank who was its principal stockholder and
chief executive officer, having general care over practically all its
transactions, acts within the apparent scope of his authority in pur-
chasing real estate to save the bank from apprehended loss on an
improvident loan to a brick manufacturing company whose plant
was situated upon the property, which was the bank's only security;
hence it is not necessary to show that he was specially authorized by
the board of directors.

PRINCIPAL AND AGENT — CONTRACT BY AGENT—EVIDENCE—ADMIS-
SIBILITY. Upon an issue as to whether a cashier had made a con-
tract on behalf of a bank, as claimed by defendants, although the
contract was in the name of the vice president individually, evidence
of the transaction with the cashier and papers used by him at the
time, tending to support the defendants' claim, are admissible.

Appeal from a judgment of the superior court for Benton
county, Holcomb, J., entered April 1, 1914, upon the verdict

[1]Reported in 151 Pac. 1129.

of a jury rendered in favor of the defendants, in an action on
promissory notes. Affirmed.

*Moulton & Jeffrey*, for appellant.

*Englehart & Rigg*, for respondents.

FULLERTON, J.—The appellant, the First National Bank
of Kennewick, brought this action against the respondents
Conway, seeking to recover upon two promissory notes, the
one for $1,500 and the other for $1,000, and an overdraft
of $302.98 which the respondents had incurred in their ac-
count with the bank. The respondents answered, making
certain denials and setting up a counterclaim. The counter-
claim arose out of a contract for the sale of real property.
It was alleged that the bank entered into a contract with the
respondents for the purchase of certain described real prop-
erty, agreeing to pay therefor a price in excess of the
amounts claimed to be due on the notes and the overdraft;
that while, for the convenience of the bank, the contract was
taken in the name of W. R. Amon, its vice president, the con-
tract was in fact the contract of the bank, entered into for
its use and benefit, and that it was the sole and only party in
interest therein, and judgment was demanded for the differ-
ence between the sum due upon the notes and overdraft and
the amount of the agreed purchase price of the property.
The allegations of the answer were put in issue by appro-
priate denials. At the trial it developed that there was no
issue between the parties as to the amounts of their re-
spective claims, but that the sole issue was whether the con-
tract relied upon as a counterclaim was in fact the contract
of the bank, and whether the bank was liable thereon, con-
ceding it to be its contract. The issues of fact were tried to
a jury, and the trial resulted in a verdict and judgment for
the respondents.

The evidence developed at the trial, and relied upon by the
respondents to support a recovery was, in substance, this:

In 1908, and from that time up to the entry of the judgment in the action, the appellant was a banking corporation doing business at Kennewick as a national bank. L. E. Johnson was at first its cashier and afterwards its president, holding his respective offices during the entire period. As cashier and president, he was the bank's executive officer and the person through whom the public dealt when transacting business with the bank. In 1908, a corporation operating under the name of the Columbia River Clay Company was engaged in the business of manufacturing brick and other clay products at a place near Kennewick. Its plant consisted of the usual machinery used for such purposes, and was located on a ten-acre tract of land which the company had contracted to purchase from the respondents. In the prosecution of its business, the clay company had become indebted to the appellant bank in a sum approximating $5,000, and had assigned its interest in the contract of purchase to the bank, the bank holding no other security therefor. The contract contained clauses providing for its forfeiture in case of a default in the payment of any installment of the purchase price on its maturity, which forfeiture carried with it a forfeiture of all prior payments, and the materials, machinery and improvements which might then be upon the premises.

In the fall of 1909, the company failed to pay an installment of principal due, and a forfeiture was declared by the vendors. This left the bank without security for the indebtedness due it from the clay company. Shortly after the declaration of forfeiture was made, Mr. Johnson, the then cashier of the bank, approached Mr. Conway, told him of the clay company's indebtedness to the bank, expressed his belief that there would be a demand in the near future for the company's products, and inquired on what terms the bank could purchase that part of the property described in the clay company's contract on which the improvements and brick making plant was situated; further expressing the belief that if the bank could obtain such property, it could

operate the plant at a profit and thereby recoup its losses
caused by the advancements made to the clay company.
After some negotiations, an agreement was entered into by
the terms of which the bank agreed to purchase the south
half of the ten-acre tract for a consideration of $3,750, pay-
able on or before three years after the date of the contract.
When the contract was about to be reduced to writing, Mr.
Johnson stated that there were legal objections to taking
the contract in the name of the bank, and inquired whether
it would be satisfactory to take the contract in the name of
W. R. Amon, the then vice president of the bank.  Mr. Con-
way assented to this arrangement and the contract was exe-
cuted on January 3, 1910, as if between the respondents and
Amon, the bank's name being nowhere mentioned therein. .

Concerning the transaction, Mr. Conway testified in part
as follows:

"At the time the contract was entered into this property
was in my possession and immediately upon the signing up
of these articles it was turned over to the First National Bank.
They have had possession ever since and are in possession
now.   I have no possession whatever.   Since the execution
of this contract they have manufactured brick there and
have taken brick away and built a railroad spur to it.   They
have removed soil and clay by manufacturing brick for two
years I believe; and as late as last April, they disposed of
clay to surface the base ball land; hauled it away three-
fourths of a mile from the land and are still removing brick
occasionally.   .   .   .

"When I transacted this business, I did not discuss it with
Mr. Amon.   I did all the business with the First National
Bank and with Mr. Johnson, cashier.   Mr. Amon has not
had anything to do with it since the contract was made.   I
talked with Mr. Johnson about paying the amount unpaid
on this contract about two weeks before the contract was
finally due, which was January 3, 1913.   Mr. Johnson
sent for me to come to the bank to see him in regard to
the matter.   He never paid me royalty as agreed in the con-
tract and has not paid me any cash on account of the con-
tract.   After they made brick there for a part of one season

I went to Mr. Johnson for money on this royalty. This royalty was to be paid as the brick were made. They never made any statement of how many bricks they had made. Mr. Johnson explained the condition of the old people (meaning Neible, Coulson and Williams) and the heavy expense they were under, putting in machinery and hiring help and had made no sales to speak of and proposed that I give them a note and he would let me have what money I needed then and as they began to sell brick he would credit it on these notes. I gave a note for $1,500 in August and a note for $1,000 the following January. When I gave these notes Mr. Johnson said they needed the notes to balance up their books in case of examination and that if we needed more money to come in and they would finally give us royalty credit on the notes.

"Afterwards I had another talk with Mr. Johnson. He sent for me to come in. Mr. Johnson said: 'The anniversary of our brickyard deal is about here and we are in no better shape to pay now than at the beginning. Isn't there some way that we can trade you a piece of land on this deal?' And he named over different pieces of land that the bank had to take. I explained to him that we had all the land we could handle and that it was impossible. We dickered and tried for a month and finally came to the understanding: Mr. Johnson figured out the differences and placed them on slips, and the agreement we came to, he was to pay in cash the difference between the notes and what was due on the contract, if I would issue new notes and take up the old, he agreeing to reduce the interest on the new notes to eight per cent, the same as the contract drew, so that one account would offset the other, and leave the notes in the bank until we could dispose of the brickyard proposition, and with the money they would take up the notes. The amount would balance up and they pay the $1,500.

"Mr. Johnson drew the escrow agreement in January, 1913. I did not execute that escrow agreement as there was a misunderstanding in regard to the clause in the contract on their part. In the contract, in selling the piece of land to the First National Bank, they agreed to put a ditch down through their land to take water from a piece of land we had above that to keep it from overflowing, and they had a ditch partially constructed and contended that the ditch

was completed, and the fact of the matter was that it lacked about a foot and a half of being deep enough. I wouldn't dig the ditch. He figured up how we stood, how much they owed us and how much we owed them. He wanted to put in notes for this amount and deposit it in escrow with a deed to this property."

On cross-examination he testified:

"The conversation that I had relative to the making of this contract in January, 1910, was with Mr. Johnson. I didn't talk with Mr. Amon about it at all. I never talked with Mr. Amon about it until some time in April, 1913. I didn't discuss the matter with him at the time he signed it. The first conversation between myself and Mr. Johnson was during the fall of 1909 before this contract was entered into. The matter was delayed and it was threshed over a good deal before the contract was finally closed up. I got into possession of the land under the old contract after its forfeiture by serving notice on the First National Bank and the other three parties concerned. I actually took possession of the land and the stuff that was there by closing up the entrance to the fence all around so no one could get in or out without tearing down the fence.

"After this contract was made, I delivered possession to the bank. I don't know anything about who went to making brick. I know whom I did my business with. I paid no further attention. I did my business with the cashier of the bank, Mr. Johnson. The land contract was made payable at the bank. . . .

"He never mentioned Mr. Amon's name until we had come to an agreement. Then he explained to me that it was necessary to use the name of one of the officers of the bank; that it was not lawful for the bank to hold real estate; and he asked me if Mr. Amon's name would be agreeable and I told him it would. That was all that was said until we came to sign up the agreement. And he called Mr. Amon into the private office and explained to him our agreement about using his name and I signed the contract then and there."

There was a conflict in the testimony. Mr. Johnson denied much that was testified to by Mr. Conway, and concerning the contract, testified that it was what it purported to

be upon its face, a contract between the respondents and Mr. Amon, and that the nature of the transaction was fully understood by respondents. This conflict, however, was resolved by the jury in favor of the respondents, and in this court their findings must, of course, be accepted as conclusive.

The testimony of the respondent relative to the person with whom the contract of purchase was actually made was permitted to go to the jury over the objection of the appellant, and the action of the trial court in that behalf forms the basis of a number of the principal assignments of error relied upon in this court for reversal. It is argued that, in this state, a contract for the conveyance of real property must be in writing, and that to permit one party to such a contract to show that another party thereto is not the real party in interest therein is to violate that cardinal rule of evidence to the effect that a prior or contemporaneous parol agreement cannot be shown to vary the terms of a written instrument. But while the authorities are not in entire harmony upon the question, the prevailing rule is that a principal may be charged upon a written executory contract entered into by his agent in the agent's name, when acting within his authority, although the name of the principal does not appear in the instrument, and his interest therein was or was not disclosed to the other contracting party; and the rule applies also to those contracts which are required to be in writing, as well as to those where a writing is not essential to their validity.

There are, of course, well recognized exceptions to the rule. It does not apply, as its mere statement indicates, to specialties, such as the common law required to be under seal, or such as the statute requires to be executed with similar formality, of which deeds and mortgages of real property are examples. Nor does it apply to negotiable instruments, as persons "dealing with negotiable instruments are presumed to take them on the credit of the parties whose

names appear upon them;" nor perhaps where special knowl-
edge, skill or some personal quality of the party is an essen-
tial ingredient in the contract; nor is such evidence admissible
to discharge the agent who contracts as a principal, as such
proof would vary the written terms of the agreement. But,
aside from these and perhaps other special exceptions, it can
be shown by oral evidence that other and different persons
than those named in the contract are bound by the terms
thereof; this on the principle that the court looks to the sub-
stantial party in interest, thus avoiding circuity of action,
saving, at the same time, the rights of all of the parties.

The rule is stated by Judge Wolverton in *Barbre v.
Goodale*, 28 Ore. 465, 38 Pac. 67, 43 Pac. 378, in the follow-
ing language:

"The question is here presented whether it is competent
to show by parol testimony that a contract executed by and
in the name of an agent is the contract of the principal,
where the principal was known to the other contracting
party at the date of its execution. There are two opinions
touching the question among American authorities,—the one
affirming and the other denying; but the case is one of first
impression here, and we feel constrained to adopt the rule
which may seem the more compatible with the promotion of
justice, and the exaction of honest and candid transactions
between individuals. The English authorities are agreed
that parol evidence is admissible to show that a written con-
tract executed in the name of an agent is the contract of the
principal, whether he was known or unknown; and the Ameri-
can authorities are a unit so far as the rule is applied to an
unknown principal, but disagree where he was known at the
time the contract was executed or entered into by the parties.
All the authorities, both English and American, concur in
holding that, as applied to such contracts executed when the
principal was unknown, parol evidence which shows that the
agent who made the contract in his own name was acting for
the principal does not contradict the writing, but simply ex-
plains the transaction; for the effect is not to show that the
person appearing to be bound is not bound, but to show that
some other person is bound also. And those authorities

17—87 WASH.

which deny the application of the rule where the principal was known do not assert or maintain that such parol testimony tends to vary or contradict the written contract, but find support upon the doctrine of estoppel, it being maintained that a party thus dealing with an agent of a known principal elects to rely solely upon the agent's responsibility, and is therefore estopped to proceed against the principal. The underlying principle, therefore, upon which the authorities seem to diverge, is the presumption created by the execution of the contract in the name of the agent, and the acceptance thereof by a party, where the principal is known. Is this presumption conclusive or is it disputable? Without attempting to reconcile the decisions, we believe the better rule to be that the presumption thus created is a disputable one, and that the intention of the party must be gathered from his words, and the various circumstances which surround the transaction, as its practical effect is to promote justice and fair dealing. The principal may have recourse to the same doctrine to bind the party thus entering into contract with his agent. Parol evidence, however, is not admissible to discharge the agent, as the party with whom he has dealt has his election as to whether he will hold him or the principal responsible. This doctrine must be limited to simple contracts, and may not be extended to negotiable instruments and specialties under seal, as they constitute an exception to the rule."

In *Nash v. Towne*, 5 Wall. 689, it is said:

"Where a simple contract, other than a bill or note, is made by an agent, the principal whom he represents may in general maintain an action upon it in his own name, and parol evidence is admissible, although the contract is in writing, to show that the person named in the contract was an agent, and that he was acting for his principal. Such evidence, says Baron Parke, does not deny that the contract binds those whom on its face its purports to bind, but shows that it also binds another, and that principle has been fully adopted by this court.

"Cases may be found, also, where it is held that the plaintiff may prove by parol that the other contracting party named in the contract was but the agent of an undisclosed

principal, and in that state of the case he may have his remedy against either at his election.

"Evidence to that effect will be admitted to charge the principal or to enable him to sue in his own name, but the agent who binds himself is never allowed to contradict the writing by proving that he contracted only as agent, and not as principal."

So, in 4 Elliott on Contracts at § 2849:

"Although extrinsic evidence will not ordinarily be received to vary or contradict a written instrument, such evidence may be admissible to charge an undisclosed principal, or one who, though disclosed, is not named in the instrument. The purpose of such evidence is not, however, to vary or contradict the contract or exonerate the agent but to show the true nature of the transaction where the contract is ambiguous or to show who is the real party making the contract whether he does so in his own name or that of another, and to give effect to the established rule of law that an undisclosed principal may, upon his disclosure, be held to a contract made in his behalf by an authorized agent."

Our own case of *Brewster v. Baxter*, 2 Wash. Ter. 135, 3 Pac. 844, also announces the same rule. It was there held competent to show that a written contract of sale executed by an executrix in her own name was in fact executed by her in her capacity as executrix. See, also, *Byington v. Simpson*, 134 Mass. 169, 45 Am. Rep. 314; *Sanger v. Warren*, 91 Tex. 472, 44 S. W. 477, 66 Am. St. 913; *Briggs v. Partridge*, 64 N. Y. 357, 21 Am. Rep. 617; *Battey v. Lunt, Moss & Co.*, 30 R. I. 1, 73 Atl. 353, 136 Am. St. 926.

In this state executory contracts for the conveyance of real property, while required to be in writing, are not specialties, but are simple contracts, valid when signed by the parties to be charged, whether or not they are executed with the formalities required for the execution of deeds. *Langert v. Ross*, 1 Wash. 250, 24 Pac. 443; *Vail v. Tillman*, 2 Wash. 476, 27 Pac. 76; *Baker-Boyer Nat. Bank v. Hughson*, 5 Wash. 100, 31 Pac. 423; *Anderson v. Wallace Lumber & Mfg. Co.*, 30 Wash. 147, 70 Pac. 247; *Bronx Investment Co.*

*v. National Bank of Commerce of Seattle*, 47 Wash. 566, 92 Pac. 380. It is also the rule that if an instrument is valid as a simple contract, it partakes of the nature of a simple contract even though executed with the formalities required for the execution of a specialty. *Stowell v. Eldred*, 39 Wis. 614.

From these considerations we think it follows that, in the present case, it was competent to show by oral evidence that the contract of sale in question, while ostensibly made between the respondents and Amon, was in fact made between the respondents and the appellant bank. Indeed, the rule which permits such a showing to be made is peculiarly applicable to the facts disclosed by the record. The negotiations leading up to the writing were had between the respondents and the bank's cashier and manager, the person whom its directors held out to the public as authorized to speak for the bank. All of the negotiations were conducted by him as the bank's representative. He suggested the name of Amon as the other party to the contract only after the negotiations had been concluded and nothing remained to be done other than to reduce the contract to writing. Even then he was not represented to be the real party in interest. On the contrary, the representation was that his name was used as another name for the bank, to avoid some supposed legal objection to the taking of the contract directly in the name of the bank. After the contract was executed, the bank took possession of the property through its own agents. It has since applied the profits arising from such possession to its own use. Amon nowhere subsequently appears in the transactions. The notes given and the overdraft incurred for which this action is prosecuted, while ostensibly direct loans from the bank to the respondents, were in fact treated by the parties as advancements upon the purchase price of the land. Plainly, to our minds, it would be a denial of justice and fair dealing to hold that the respondents are prohibited from showing the real nature of the transaction.

But it is contended that the contract was one beyond the powers of the bank to make, and if the bank did undertake to make it, the contract was *ultra vires* and void. But, conceding that a national bank cannot buy or deal in real estate as a means of investing its funds, there is no question but that it can take title to such property as a means of saving itself from apprehended loss caused by a mistaken or ill-advised loan. It is so expressly provided in the act under which it holds its charter. U. S. Rev. Stat., § 5137. So it may, when it deems it necessary to take real property to save itself from apprehended loss, make all advances necessary to protect the title to such real property. *Cockrill v. Abeles*, 86 Fed. 505; *Upton v. National Bank of South Reading*, 120 Mass. 153; *Holmes v. Boyd*, 90 Ind. 332.

In the case from Massachusetts, this language was used:

"While it is not lawful for banking associations, established under the U. S. St. of 1864, c. 106, to purchase, hold and convey real estate except in certain specified cases, among those exceptions are included such real estate 'as shall be mortgaged to it in good faith by way of security for debts previously contracted; such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings; such as it shall purchase at sales under judgments, decrees or mortgages held by such association, or shall purchase to secure debts due to said association.' Under the latter clause it cannot be deemed that the only authority given to such associations is to purchase only to the exact amount of the debts which may be owing to them, but they are entitled to purchase such real estate as may be necessary in order to secure the debts due to them so long as the security of such debts is the real object of the purchase."

There was evidence in the present case from which the jury could find that the purpose of the bank in this instance was to protect itself from loss on an improvident loan. It had suffered a prior contractor for the purchase of this property to become largely indebted to it without other security than its interest in the property. The property was suitable for prosecution of a special industry and had on it a large quan-

tity of machinery, making it immediately available for the prosecution of that industry. It was thought by the manager of the bank that if the property was acquired by the bank the industry could be prosecuted at a profit, and the bank thereby not only recoup itself for the advances made, but for the loss certainly to follow if it took no further steps in the matter. Under these circumstances, we think it too much to say, however ill-advised the scheme itself may have been, that the bank acted beyond its powers.

Again, it is said that the transaction concerning the purchase of the real property in this instance was beyond the ordinary powers of a cashier and manager of a national bank, and that the burden was upon the respondents to show that he had authority from the board of directors of the bank to enter into the contract, which burden they did not meet. But without entering upon a discussion of the general powers of a cashier of a national bank who also occupies the position of its general manager, we think the record shows ample authority in the cashier in this instance to make the contract on behalf of the bank. It is conceded that, at the time the contract was entered into, "Johnson was cashier and chief executive officer of the bank; that as such, he managed all the business of the bank ordinarily coming within the duties of a bank cashier; and that practically all transactions of the bank were under his general care." In addition to this, he was shown to be the principal stockholder of the bank, and the only person held out by the bank to represent it in its business transactions. He also represented the bank when possession of the land was taken after the execution of the contract, and represented the bank when the notes and overdraft sued upon were taken and incurred, and it was he who made the representations on the part of the bank to the effect that the amount of the notes and the overdraft should be treated as partial payments upon the purchase price of the property when that obligation became due. Seemingly, the conduct of the business, after possession of the property was

taken over, realized no profits, but such income as there was from the business was collected and disbursed by the bank, and no part of the royalties reserved in the contract on the brick manufactured were paid over to the respondents. The powers of a cashier and manager of a bank must, of course, differ under different situations. Being the agent of the bank, his acts are governed by the general rules applicable to agents. If the directors of the bank intrust the entire management of the bank to such an officer, they cannot be heard to deny his authority to do any act which they might lawfully authorize him to do.

"Officers of banks are held out to the public as having authority to act according to the general usage, practice and course of business of such institutions, and their acts, within the scope of such usage, practice and course of business, bind the bank in favor of third persons having no knowledge of a limitation on their authority, and it is immaterial what the person's official position may be if he is actually engaged in the management of the bank's interests. If a bank does not wish the public to deal with any particular one of its officers, at the regular place of business, in a particular line of that business, it is its duty so to notify the public in some effectual way." 3 R. C. L. 437.

Such, it seems to us, was the situation here, and we can but conclude that the cashier's acts were within the apparent scope of his authority, even if they were not within the actual scope.

It is objected that the court erred in permitting the respondent Charles Conway to testify concerning the escrow agreement hereinbefore mentioned, and in admitting in evidence the draft of the proposed escrow agreement and the sheets of paper used by the cashier in stating the mutual obligations of the parties and the balance due at that time to the respondent. But we think these instruments clearly admissible. It was denied in the answer of the bank that the obligation incurred in the contract for the purchase of the real property was the obligation of the bank. This testimony was

admissible on that issue. It tended to establish the affirmative of the issue made by the bank's denials.

Other assignments of error are met by what we have said upon the principal questions discussed. The judgment is affirmed.

MORRIS, C. J., ELLIS, and MAIN, JJ., concur.