[No. 18325.   Department One.   July 9, 1924.]

NORTHERN BANK & TRUST COMPANY et al., Appellants, v. A. SCHUBACH et al., Respondents, J. BERGER et al., Defendants.[1]

RELEASE (2, 8)—CONSIDERATION—EVIDENCE—SUFFICIENCY. Findings that a bank released the signer of a note for $5,000 upon a joint maker's agreement in writing to assume payment of the note, are sustained where the agreement was first shown to and approved by the president of the bank, who agreed to the release in consideration of an agreement to secure for the bank substantial deposits of a large shipbuilding concern, which was done until the bank became insolvent.

Appeal from a judgment of the superior court for King county, Ralston, J., entered July 5, 1923, upon findings in favor of the defendants, in an action on a promissory note, tried to the court. Affirmed.

[1]Reported in 227 Pac. 22.

*Andrew Christensen, Ward Hunt,* and *Paul F. McKenna (Charles S. Hills,* of counsel), for appellants.

*Bruce C. Shorts* and *Stratton & Kane,* for respondents.

HOLCOMB, J.—This suit is upon a promissory note for $5,000, signed by the defendant J. Berger and the respondent A. Schubach, in favor of the Northern Bank & Trust Company. The Northern Bank & Trust Company having become insolvent passed into the hands of the state banking department, which brought the suit. The liquidator waived the right to proceed against defendants Berger and seeks only to recover from respondents Schubach. After the execution of the note, an agreement was made between respondent A. Schubach and Berger, and reduced to writing, whereby, among other things, Berger assumed the payment of the note on which this suit is brought. Before signing the agreement, Schubach submitted it to one Collier, then president of the Northern Bank & Trust Company, and asked Collier if the contract would be satisfactory to him. The record shows the following evidence as to what occurred between Schubach and Collier:

"Q. Before you signed this agreement state whether or not you showed it to Mr. Collier, at that time the president of the Northern Bank & Trust Company? A. I did; I showed it to Mr. Collier and gave him a copy of that agreement, left a copy with him. Q. Was that before it was executed and delivered? A. Before it was executed. This letter was drafted, if I remember correctly, by Mr. Albright, the attorney for Mr. Berger. Before I would sign that I took it over to Mr. Collier and asked him whether he would be agreeable to this. Q. Did Mr. Collier read that agreement before you signed it? A. He agreed that I should be relieved

of the obligation on the note and to go ahead and sanctioned this agreement. Q. I say, did he read it before you signed it; did Collier read it? A. He did. Q. Now what conversation did you have with Collier at the time he read the letter before you signed it and what agreement did you have with him? A. Mr. Collier said, 'If I do this for you I want you to do something for us,' and I asked him what that was and he said, 'You have control of large sums of money and you can help me by putting some of that money in this bank here and keep it on deposit and open a drawing account.' I told him that I had control over the funds of the Grays Harbor Shipbuilding Company and that I would be very glad, in consideration of this release, to deposit with him substantial sums of money from time to time. After that was done and said I went back to the office of Mr. Albright and I signed this agreement. Q. After you signed it did you take a copy to the bank and leave it with the bank, with Mr. Collier? A. Yes, sir, I did; I did; when I first brought this up I left a copy with him. Q. Was Collier's consent to this arrangement between you and Berger and the bank's release of you from your obligation on the note conditioned upon your depositing substantial sums of money there? A. Yes, sir. Q. How did it happen that the note, plaintiff's Exhibit 'A', was left with the bank; why didn't you take it away with you. A. Mr. Collier explained to me at the time when I asked him to give me the note, he said 'I can't give you this note. You better leave this here until I have an opportunity to get a new note in place of this one from Mr. Berger.' And that was agreeable to me and I depended on Mr. Collier to carry out that understanding. Q. What was said by him about getting a new note from Berger and delivering this old one to you? A. What was said about——. Q. What was said about his agreeing to get a new note from Berger and delivering this old one to you? A. He said I should leave this old one with him until he had a chance to send for Berger and get a new note from him; he would then give me the old note back. He said he had to keep this in the meantime."

While the evidence is meager, it is *prima facie* sufficient to show that Collier was at the time president of, and acting for, the bank, and demanded and received a *quid pro quo* for the release of Schubach.

There is no contradiction in the record of the statement that Collier was at that time president of the bank. There is no evidence in the record that Collier did not have authority to enter into such transactions. The evidence of Schubach further is that in all his dealings with the bank he never consulted anyone except Collier.

The record shows that Schubach, who was almost the sole owner of the Grays Harbor Shipbuilding Company, caused that company to deposit as much as $200,000 with the Northern Bank & Trust Company, after the agreement of release was made between him and the bank, through Collier. The record also shows that the accounts were changed at one time from that of the shipbuilding company to the name of Schubach, as trustee, and that Schubach had a personal account with the bank also. The day the bank failed, on January 29, 1917, Schubach made a deposit of a few hundred dollars in the bank, after having had a talk with Collier about the condition of the bank, in which Collier assured him that the bank was all right, and that rumors which were current on the streets of Seattle as to the bad condition of the bank were unfounded and promoted by enemies of the bank. The accounts in the bank were very much confused, but the record shows that there was on deposit in the bank in the name of Schubach, as trustee, funds which belonged to the shipbuilding company of over $40,000, which respondent lost. The deposits in the bank after the agreement between Schubach and Collier covered a period from October 23, 1916, to January 29, 1917, when the bank failed.

The state of the record convinces us that the agreement to release was made as testified to; that Collier had apparent authority to make such release, and that the bank very greatly benefited therefrom. Since there is no evidence that Collier was not president of the bank, or have such authority, we are satisfied that the finding of the trial court that the bank released respondents from their obligation upon the note in suit is correct and should be affirmed. See: *First National Bank of Kennewick v. Conway,* 87 Wash. 506, 151 Pac. 1129; 3 R. C. L. 437.

Affirmed.

MAIN, C. J., TOLMAN, MACKINTOSH, and PARKER, JJ., concur.