[No. 12682. Department Two. November 9, 1915.]

UNION SAVINGS & TRUST COMPANY OF SEATTLE, *Appellant*,

v. J. T. KRUMM, *Respondent*.[1]

BANKS AND BANKING—TRUST COMPANIES—POWERS—SAVING DEBT.
A trust company, engaged also in the banking business, as author-
ized by Rem. & Bal. Code, § 3349, has all the implied power of a
bank to take any steps necessary to save a debt.

SAME—POWERS—SAVING DEBT—ACTS ULTRA VIRES—INTENT—QUES-
TION FOR JURY. The acts of the manager of a branch bank in taking
over and operating the business of a lumber company to save the
bank from loss upon a bad debt, even though without the knowledge
or consent of the directors, are not *ultra vires;* since the bank had
power to authorize the acts, if originally intended in good faith to
save a debt, which would be a question for the jury.

SAME—MANAGER OF BRANCH—APPARENT AUTHORITY—QUESTION FOR
JURY. Whether the manager of a branch bank acted within the
scope of his apparent authority in taking over and operating the
business of a lumber company, in order to save a debt, is a question
for the jury, where it appears that for five years he was in sole
charge with general authority, and the only person held out to the
world as manager with whom the public came in contact, that very
slight control or supervision was exercised over him, and he had
repeatedly been authorized to make contracts of a similar character,
the party dealing with him having no knowledge of any special
authority in the prior instances.

FRAUDS, STATUTE OF—DEBT OF ANOTHER—INDEPENDENT CONTRACT.
Where a bank had taken over and was operating the business of a
lumber company to save a debt, a contract made directly by the man-
ager of the bank with a logger relating to hauling logs and the
operation of the lumber company, is not a contract to answer for the
debt of another, within the statute of frauds, where the logger was
informed that the bank was operating the lumber company in its
name.

SAME—ORAL AGREEMENT NOT TO BE PERFORMED IN ONE YEAR. A
logging contract to cut and deliver logs for a period of two years,
and a contract for hauling lumber requiring the logger to first con-
struct a road, purchase teams and wagons, and thereafter haul the
lumber for a period of one year, are void, if not in writing, under
the statute of frauds, declaring void every oral agreement that by

[1]Reported in 152 Pac. 681.

its terms is not to be performed "in one year from the making thereof."

SAME—AGREEMENT NOT TO BE PERFORMED IN ONE YEAR—PARTIAL PERFORMANCE. Partial performance of an oral contract which is not by its terms to be performed within one year does not take it out of the operation of the statute of frauds.

SAME—AGREEMENT NOT TO BE PERFORMED IN ONE YEAR—RECOVERY ON QUANTUM MERUIT. Partial performance of a contract for services which by its terms is void under the statute of frauds in that it is not to be performed within one year, entitles the party rendering the service to recovery on a *quantum meruit*, measured by the terms of the contract, for the services rendered and accepted by the other party, upon the principle of equitable estoppel.

Appeal from a judgment of the superior court for King county, Mackintosh, J., entered June 3, 1914, upon the verdict of a jury rendered in favor of the defendant, in an action to recover an overdraft. Modified.

*McClure & McClure* and *Donworth & Todd*, for appellant.

*Griffin & Griffin* and *Walter S. Fulton*, for respondent.

ELLIS, J.—The plaintiff brought this action to recover an overdraft of the defendant at its Renton branch, amounting, as alleged, to $4,931.12. The answer of the defendant consisted of denials, five affirmative defenses, and four counterclaims. The first affirmative defense set up a credit of $4,300. This the jury allowed by a special verdict, finding the defendant indebted to the plaintiff on the overdraft in the sum of $631.12. It is admitted that this finding was fully supported by the evidence, no error being assigned upon it.

In the second affirmative defense and first counterclaim, it was alleged that the Orillia Lumber Company and the plaintiff entered into a contract with the defendant on the last day of April, 1912, whereby he was to cut and deliver to the lumber company, and to the plaintiff at the mill of the lumber company, saw logs at the price of $4 per thousand feet, board measure, the plaintiff and the lumber com-

pany agreeing to receive and pay for not less than 25,000 feet of logs for each working day for two years, extending from the last day of April, 1912, to July 15, 1914; that the defendant delivered logs under such agreement to the amount of 4,937,050 feet, at the agreed price of $19,748.42, and that there was due a balance thereon of $576.02. This sum was also allowed by special verdict.

In his third affirmative defense and second counterclaim, the defendant set up damages in the sum of $8,000 for loss of profits because of the failure of the plaintiff to receive more than the logs above mentioned, or to receive logs at all after April 4, 1914, under the agreement pleaded in the first counterclaim. By a special verdict the jury found $5,299 damages on this second counterclaim.

In the fourth affirmative defense and third counterclaim, it was averred that the lumber company and the plaintiff, on January 1, 1913, entered into an agreement with the defendant whereby he was to purchase teams and wagons, build a road necessary to be built, and haul lumber from the sawmill of the lumber company to the railroad station at Orillia at the price of $2 per thousand feet, and that the lumber company and the plaintiff were to furnish him not less than 25,000 feet of lumber per day to haul at that price for not less than one year; that, pursuant to this agreement, he hauled lumber from March 1, 1913, to April 4, 1913, and that there was a balance due for that service amounting to $1,596.87. In this counterclaim he further alleged damage in the sum of $2,000, through the failure of the plaintiff to carry out the agreement after the 3d day of April, 1913. On this third counterclaim the jury, by a special verdict, allowed $1,596.87 as the balance due for services performed, and $1,750 damages in loss of profits.

The fifth affirmative defense and fourth counterclaim was for $36 for hauling brick from Orillia to the mill of the Orillia Lumber Company, which it was alleged the defend-

ant did under an agreement with the plaintiff. By a special finding, the jury also allowed this amount.

Prior to final issue, the plaintiff moved to strike from the second and third counterclaims the allegations of damages through plaintiff's failure to accept logs from, and furnish lumber to the defendant to haul. This motion was denied.

The reply put in issue the making of the contracts alleged in the counterclaims, denied on information and belief that the defendant performed the services alleged, and set up affirmatively that such contracts, if made by any one purporting to be its agent or representative, were *ultra vires*.

The evidence was voluminous. We shall not attempt to state more than the salient facts. The plaintiff is a trust company doing a general trust company and banking business with its principal office in the city of Seattle, and is operating a branch bank at the town of Renton, in King county. At the time of the various transactions here in question, one O. B. Woolley was the manager of the Renton branch, his name appearing as such both on the stationery and on the front window of the banking building in Renton. It appears from the evidence that he had no express authority to make loans in excess of $1,000 without submitting them to the officers and directors of the parent concern, but it also appears that he had sometimes exceeded this authority to the knowledge of, and without objection from, the officers and directors. There was no circumstance in evidence from which notice to the public of this or any other limitations of his authority could be implied. For some years, the plaintiff, through its Renton branch, had from time to time made loans to the Orillia Lumber Company, which indebtedness had reached an aggregate prior to this time of about $11,500, which it was admitted was authorized by the officers and directors of the plaintiff. To secure this indebtedness, the plaintiff held a mortgage on the lumber company's plant and other assets.

In addition to this indebtedness, Woolley, as manager of the Renton branch, had from time to time advanced further moneys to the lumber company without the knowledge of the officers or directors and without security, so that the indebtedness, including that authorized, amounted to between $15,000 and $20,000 in the spring of 1912. About that time the mill, through an explosion and consequent fire, was destroyed. Woolley, in order to save this indebtedness, entered into an arrangement with Struthers and Hightower, officers and chief stockholders of the Orillia Lumber Company, whereby the plaintiff was to take over the business of the lumber company, rebuild the mill, operate it in the name of the lumber company until the indebtedness should be paid, and then turn it back to the lumber company. It appears that the money advanced for this purpose and in operating the mill in pursuance of this agreement was advanced by Woolley without the knowledge of the officers or directors of the trust company, and that the whole transaction was concealed from the company by means of a system of false bookkeeping. It was in pursuance of this arrangement that Woolley entered into the agreements with the defendant here for the cutting and hauling of logs, for the hauling of lumber and for the hauling of brick, as set out in the defendant's several counterclaims. The making of these contracts and their performance by the defendant substantially as set out in the counterclaims, was fully sustained by the evidence. It was admitted that all of the defendant's contracts were oral.

At the conclusion of the evidence, plaintiff challenged its sufficiency to sustain the second, third and fourth counterclaims, on the grounds that the contracts therein alleged were *ultra vires;* that the contracts, if made, were made by an agent without actual authority and outside of the apparent scope of his authority; that the contracts being oral, were void under the statute of frauds. The challenge was overruled. The plaintiff requested that the jury be instructed

to return a verdict in its favor upon the second, third and fourth counterclaims, and each of them. This request was denied. The jury, in addition to the special verdicts above mentioned, returned a general verdict in favor of the defendant for $8,599.77, being the full amount found due to the defendant in the special verdicts less $631.12 found due to the plaintiff on the overdraft. After verdict, the plaintiff moved for judgment *non obstante* for the amount found due on the overdraft, and in the alternative for a new trial, upon all the statutory grounds. These motions were overruled. Judgment was entered in favor of the defendant on the general verdict. The plaintiff appeals.

The appellant contends: (1) That the acts of Woolley in taking over and operating the mill were *ultra vires* of the trust company, and that therefore the contracts with the respondent in furtherance of that transaction were void; (2) that the taking over of the mill and the making of the contracts with the respondent were outside of the actual authority of Woolley as manager, and were not within the apparent scope of his authority, and the contracts therefore cannot be enforced; (3) that the logging contract was, in substance, an oral undertaking on the appellant's part to answer for the debt of the lumber company, and was therefore void under the statute of frauds; (4) that the contracts for logging and for hauling lumber were contracts by their terms not to be performed in one year from the making thereof, and, being oral, were void under the statute of frauds.

I. The first two questions must not be confused in this discussion. If the directors of the trust company could have legally authorized the ·taking over of the management of the mill for the purpose of paying or reducing the debt of the lumber company to the trust company, then it is obvious, however invalid it may have been for lack of such antecedent authorization, that the transaction was not *ultra vires*.

Though the appellant was organized as a trust company, it is admitted that, in addition to its business as a trust company, it was, and is, engaged also in a general banking business, as it has the unquestioned power to do under the act governing trust companies. Rem. & Bal. Code, § 3349 (P. C. 41 § 113). It therefore had every implied power that any bank would have, so far as not prohibited by the express terms of the act governing trust companies. There is nothing in that act limiting the power of such companies to take any steps necessary to save a debt. It is admitted that the lumber company was heavily indebted to the trust company. The mill had been destroyed and the lumber company had neither money nor credit to rebuild it, though it owned timber and other unproductive property of considerable value. There can be no question that the taking over of the mill by Woolley was intended in good faith on both sides to save this debt. The fact that Woolley also desired to conceal the true situation from the directors does not alter the case. Undoubtedly, under the circumstances, the directors of the trust company could have authorized the doing of the very thing which their manager did in order to reduce or pay off the indebtedness. The rule in such cases is well stated as follows:

"To save a debt, a bank may take real estate or personal property, by conveyance or purchase at foreclosure sale of a mortgage held by it as collateral, or otherwise, and may hold such property, not permanently, but a reasonable time, to enable it to realize advantageous sale of it. A bank may even temporarily engage in a business entirely foreign, in order to save its claim, and in short may do any act a prudent man would do under the same circumstances for that purpose." 1 Morse, Banks and Banking (3d ed.), § 60.

See, also, same work § 78. For two cases closely analogous on the facts and indistinguishable from this in principle see: *Roebling Son's Co. v. First Nat. Bank of Richmond*, 30 Fed. 744; *Reynolds v. Simpson & Ledbetter*, 74 Ga. 454. This court, in a recent case, on facts closely parallel to

those here presented, so far as the question of *ultra vires* is concerned, has recognized and applied the same principle to its full extent, holding that a bank may, when it deems it necessary, take real property to save itself from apprehended loss, and make all advancements necessary to protect the title to such property. *First Nat. Bank of Kennewick v. Conway*, 87 Wash. 506, 151 Pac. 1129. The quality of the transaction as *intra vires* or *ultra vires* is not to be measured by its ultimate success or failure, but by the original good faith of its purpose as being intended to save a debt. That question is one for the jury. *First Nat. Bank of Kennewick v. Conway* and *Reynolds v. Simpson & Ledbetter, supra.*

"These authorities [citing many], we think, clearly establish the principle that any act done by a corporation which is directly incidental to the proper exercise of its franchises cannot be *ultra vires*. The bank had the undoubted power to collect the debt owing to it, and in the exercise of that right it had the incidental power to exchange the debt for property from which it honestly and reasonably supposed it could more certainly realize the money. We have already held that the bank made the exchange for those reasons. The fact, if it be a fact, that the sequel showed such exchange to be disastrous to the bank could not affect the original power to make the exchange." *Tourtelot v. Whithed*, 9 N. D. 467, 84 N. W. 8.

As sustaining the general principle involved, see, also: *First Nat. Bank of Charlotte v. National Exchange Bank of Baltimore*, 92 U. S. 122.

Moreover, the transactions here in question were not intrinsically immoral, nor contrary to any statutory inhibition. It is clear on all authority that, had the same things been done by the express authority of its officers and directors, the appellant could not now be heard to say that the contracts, at least so far as they have been performed by the respondent, were *ultra vires*, and thus defeat payment for the benefit actually received. *Creditors Claim & Adjust-*

*ment Co. v. Northwest Loan & Trust Co.,* 81 Wash. 247, 142 Pac. 670; *Tootle v. First Nat. Bank of Port Angeles,* 6 Wash. 181, 33 Pac. 345; *Hutchins v. Planters' Nat. Bank,* 128 N. C. 72, 38 S. E. 252; *Tourtelot v. Whithed, supra; Railway Co. v. McCarthy,* 96 U. S. 258; 2 Beach, Private Corporations, § 425.

II. In discussing the second question, we shall assume that the directorate of the appellant had never by any affirmative action authorized Woolley, as manager of the Renton branch, to make such contracts as those here involved. The real question is, Were the acts done within the apparent scope of his authority, in view of all the circumstances, or, more correctly speaking, was the evidence capable of justifiable inferences sufficient to take that question to the jury?

The rule is well settled that persons dealing with corporate agencies have the right to rely upon the apparent authority of those in charge of the corporate business, and for acts done within the scope of such apparent authority, the corporation is bound. It is also a rule often asserted, that "whenever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." *Parker v. Hill,* 68 Wash. 134, 146, 122 Pac. 618.

Under these rules, we think that this question can soundly be answered only in the affirmative. For five years Woolley had occupied the position of manager of the branch bank. He was the only person held out to the world by the parent concern as manager of this branch. It is fairly apparent from the evidence that he was the only person with whom the public ever came in contact in relation to the business conducted by the Renton branch. For about five years the respondent had been doing business with the branch bank, and never, so far as the record shows, had he come in contact with any other officer or agent of the bank than Woolley, as its manager. The appellant's officers claimed entire ignorance of the amount which had been loaned or charged to

the Orillia Lumber Company, giving as their only excuse for such ignorance false bookkeeping on Woolley's part. Practically the only supervision of the parent concern was to require monthly statements and examine the books once a month through its auditor.

It appears, however, without contradiction, that for at least part of the time during which Woolley was surreptitiously financing the lumber company and operating its mill, there appeared upon the books of the branch bank, which were submitted to the appellant's auditor for inspection, entries of from $275 to $290, monthly interest paid by, or charged to, the Orillia Lumber Company. The total interest account for such months amounted to $685. It would seem that, out of such a total, a charge of $290 monthly interest to a single customer, which would indicate an indebtedness of at least $30,000, ought to have led to some investigation which would have developed the real facts. One of these entries appeared as early as the month of June, 1912, not long after the first contract here in question was made. It is manifest, as admitted by appellant's cashier, that, if the auditor of the appellant or any of its officers had examined this interest account, he would have discovered these figures at the time they were entered, or shortly afterwards. It was admitted that no detailed examination of the figures in the books was ever made. It is hardly conceivable that by any sort of efficient supervision and oversight the appellant's officers would not have discovered that their manager was operating the lumber company much earlier than they did. We are impressed with respondent's statement, "I did not see how a business of that kind could be carried on and they not know anything about it." An examination of the evidence can leave no doubt that the respondent in making these contracts was acting in the utmost good faith and in the honest belief that he was dealing with the duly authorized agent of the bank in the premises. Moreover, he testified that he then knew of prior instances in which Woolley had taken

over property and made contracts of a similar character which were unquestioned. Woolley had taken over in behalf of the bank some $20,000 worth of manufactured glass from a glass company and disposed of it to save the loss of moneys loaned to the glass company. He had at one time made a logging contract for the placing of a quantity of logs in Lake Washington. While it appears that the glass transaction was authorized by the officers of the appellant bank, it does not appear that respondent had any knowledge of that fact. As pointed out in 1 Morse on Banks and Banking (4th ed.), p. 215:

"A very simple and unquestionable method of holding out is by allowing an officer repeatedly to perform any specific act, and recognizing his performance as proper and valid."

It is by no means an unimportant circumstance that Woolley was invested with the title of manager and held out to the world as such. We are not impressed with the appellant's argument that his powers would be presumed to be limited to the powers of an ordinary cashier. That he was something more than a cashier with the narrower powers implied by that title was not only manifest from the apparent slight control exercised over him, but also from the fact that there was a cashier in the branch bank who was his subordinate and under his immediate control. The actual powers of titular officers are so varied in different banks, and from time to time so varying even in the same institution, that courts have never laid down any rule as to what invariably constitutes the limits of apparent authority as confined by the inherent powers of a given office. 1 Morse, Banks and Banking (4th ed.), p. 203.

As said in *First Nat. Bank of Kennewick v. Conway, supra:*

"The powers of a cashier and manager of a bank must of course differ under different situations. Being the agent of the bank his acts are governed by the general rules applicable to agents. If the directors of the bank intrust the entire management of the bank to such an officer, they cannot be

heard to deny his authority to do any act which they might lawfully authorize him to do.

" 'Officers of banks are held out to the public as having authority to act according to the general usage, practice and course of business of such institutions, and their acts, within the scope of such usage, practice and course of business, bind the bank in favor of third persons having no knowledge of a limitation on their authority, and it is immaterial what the person's official position may be if he is actually engaged in the management of the bank's interests. If a bank does not wish the public to deal with any particular one of its officers at the regular place of business, in a particular line of that business, it is its duty so to notify the public in some effectual way.' 3 R. C. L. 437."

The case of *Wing v. Commercial & Sav. Bank*, 103 Mich. 565, 61 N. W. 1009, presents a situation not widely different from that here involved. The court said:

"If a cashier be allowed to exercise general authority in respect to the business of the bank for a considerable time,— in other words, if he is held out to the public as having authority in the premises,—the bank is bound by his acts, as in case of an agent of any other corporation, by whatever name he may be designated, in the same manner as if authority were expressly granted. The directorate of a bank cannot be permitted to neglect its duties, abandon the management to the cashier, permit him openly and notoriously and without rebuke to deal with the public as having authority, and then escape responsibility."

We are satisfied that, under all the facts of this case, whether the respondent was justified in assuming that Woolley was acting within the scope of his authority, was a question for the jury.

Some question is raised as to the sufficiency of the court's instructions on this point. We have examined them. We are also satisfied that they fully and correctly stated the law applicable to the facts.

III.    We find no merit in the claim that the logging contract was really an undertaking on the part of the appellant to answer for the debt of the lumber company and was,

therefore, void under the statute of frauds. This claim is based on the fact that the business was conducted in the name of the lumber company and that all payments made were by checks of the lumber company. The contract was made direct with Woolley as representing the bank, and Woolley then advised the respondent that the bank itself was merely operating the business in the lumber company's name. No checks were given without Woolley's express consent. *Reynolds v. Simpson & Ledbetter, supra.*

IV. The appellant's claim that the contracts for logging and for hauling lumber were contracts by their terms not to be performed in one year from the making thereof, and were therefore void under the statute of frauds, must be sustained. The logging contract, by its very terms, could not be performed short of two years after it was made. It therefore clearly fell within the purview of the statute. Rem. & Bal. Code, § 5289 (P. C. 203 § 3). The contract for hauling lumber was made in December, 1912, and, as shown by the evidence, contemplated that the respondent should first construct a road, purchase teams and wagons, and thereafter haul the lumber for a period of one year at the rate of $2 per thousand. Since the road must first be built and teams procured, it is clear that the hauling could not have been performed within one year from the making of the contract. Even though it be assumed that the building of the road was no part of the service contemplated by the contract, it was necessarily a thing to be performed antecedent to the beginning of the one year's hauling, and therefore postponed the full performance beyond the year. The authorities are almost uniform to the effect that an oral contract for a year's services, which is to commence *in futuro*, is within the statute of frauds such as ours, which declares void "every agreement that by its terms is not to be performed in one year from the making thereof." *Chase v. Hinkley*, 126 Wis. 75, 105 N. W. 230, 110 Am. St. 896, 2 L. R. A. (N. S.) 738, and note; *Sutcliffe v. Atlantic Mills*, 13 R. I. 480, 43 Am.

Rep. 39; *Fanger v. Caspary*, 87 App. Div. 417, 84 N. Y.
Supp. 410; *Kleeman & Co. v. Collins*, 9 Bush. (Ky.) 460;
*Billington v. Cahill*, 51 Hun 132, 4 N. Y. Supp. 660; *Blanck
v. Littell*, 9 Daly (N. Y. C. P.) 268; *Levison v. Stix*, 10 Daly
(N. Y.) 229.

The respondent insists that there was such part perform-
ance, both of the logging contract and of the hauling con-
tract, as to take them out of the statute of frauds. The doc-
trine of part performance, however, has no application to
this clause of the statute of frauds. In the nature of the
case, where the statute is directed solely to the time of per-
formance and not to the character or subject-matter of the
contract, part performance could not remove the ban of the
statute without in effect repealing the statute. The rule is
clearly stated by Pomeroy:

"The clause relating to contracts not to be performed
within a year from the making thereof, seems by its very
terms, to prevent any validating effect of part performance
upon all agreements embraced within it. As the prohibition
relates not to the subject-matter, nor to the nature of the
undertaking, but to the *time of the performance itself*, it
seems impossible for any part performance to alter the re-
lations of the parties, by rendering the contract one which,
by its terms, may be performed within the year. It has, in-
deed, been held in some cases, that if all the stipulations on
the part of the plaintiff are to be performed within a year,
an action will lie for a breach of the defendant's promise, al-
though it was not to be performed within the year, and was
not in writing. In all these cases, however, the promise of
the defendant was simply for the payment of the money con-
sideration, which might, in every instance, have been sued
for and recovered upon his implied promise; and the doctrine
itself has been expressly and emphatically repudiated by
numerous other decisions." Pomeroy, Contracts (2d ed.),
p. 141.

See, also, *Sheldon v. Preva*, 57 Vt. 263; *Osborne v. Kim-
ball*, 41 Kan. 187, 21 Pac. 163; *Conoly v. Harrell*, 182 Ala.

243, 62 South. 511; *Johnson v. Upper*, 38 Wash. 693, 80 Pac. 801.

Of the many cases cited by the respondent as supporting the argument that the preparation and expense which he incurred in preparing for the performance of these contracts was such part performance as to validate the contracts, only one lends even apparent support in such a case as that here presented. In *Matzger v. Arcade Building & Realty Co.*, 80 Wash. 401, 141 Pac. 900, L. R. A. 1915 A. 288, a lease, for a period longer than one year, was held void because unacknowledged. We held, however, that the payment of a bonus, going to the consideration for the entire term, was sufficient part performance to remove the ban of the statute. That case, however, rests upon another statutory provision than that here involved, and, as pointed out in the note to the text of Pomeroy above quoted, the case of agreements to lease for a longer term than one year, even when covered by the clause in question, are capable of part performance so as to be brought within the principle of equitable estoppel. Moreover, in the *Matzger* case, there were many other circumstances, such as ratification and improvement of the freehold, which are matters peculiarly applicable in cases involving the validity of a lease.

It is, however, the rule in such cases that a party performing services under a contract void as in contravention of the one-year statute of frauds may recover for the work actually performed on a *quantum meruit*, and the value of the services are measured by that fixed in the contract. This, on the principle that one who has accepted the benefit to the extent of the work performed is estopped to deny the liability. This is carrying the doctrine of estoppel as far as it can be carried in such a case without abrogating the statute.

The judgment should be reduced in the aggregate of the amounts found by the jury in the special verdict on the second counterclaim, $5,299, and for damages on the third counterclaim, $1,750, leaving the amount of the judgment

$1,550.77.   This should bear interest from the date of the original entry of the judgment.

The case is remanded with directions to modify the judgment as above indicated.

MORRIS, C. J., MAIN, and FULLERTON, JJ., concur.