# CASES

# SUPREME COURT

OF

# WASHINGTON

[No. 15173.   Department One.   May 12, 1919.]

## J. D. BENNER, *Trustee in Bankruptcy etc., Respondent,* v. ORVILLE BILLINGS, *Appellant.*[1]

FRAUDS, STATUTE OF (27)—SALE OF GOODS—PART PAYMENT—COR-PORATE STOCK—DEFERRED PAYMENTS BEYOND ONE YEAR. A contract for the sale of stock of a corporation upon which a partial payment is made is a sale of goods, wares, and merchandise, and is not void as within Rem. Code, § 5289, relating to oral contracts that are not to be performed within one year, although deferred payments extend beyond that time.

BANKRUPTCY (18) — DEBTS DUE BANKRUPT — DEFENSES — SUFFI-CIENCY OF ASSETS. In an action by a trustee in bankruptcy to recover the amount due to a bankrupt corporation on a sale of its treasury stock, the complaint need not show that the bankrupt did not have sufficient other property to pay its debts.

CORPORATIONS (107, 226)—STOCK—ACTIONS TO ENFORCE—LIABILITY—DEFENSES. In an action by a trustee in bankruptcy to recover the amount due on a sale of treasury stock, the objection that the complaint shows no tender of the stock before suit is not available where it is alleged that the stock was sold and delivered.

SAME (67, 208, 211)—STOCK—TRANSFERS — INSOLVENCY — PREFER-ENCES TO OFFICERS. Under the trust fund doctrine, an officer in control of a failing corporation cannot evade his liability for treasury stock which the corporate records show that he purchased by claiming that the apparent sale was only an option, nor can his liability be limited to the prejudice of creditors by any arrangement between himself and the corporation or by a transfer of the shares.

[1] Reported in 181 Pac. 19.

INTEREST (3)—COMPENSATION FOR USE. Where the amounts and dates of maturity of installments on a sale of treasury stock were fixed and certain, they draw interest at the rate of six per cent per annum upon maturity, under Rem. Code, § 6250.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered July 16, 1918, upon findings in favor of the plaintiff, in an action for the purchase price of stock. Affirmed.

*Hayden, Langhorne & Metzger,* for appellant.

*Carkeek, McDonald, Harris & Coryell* and *J. L. Snapp,* for respondent.

MITCHELL, J.—In October, 1917, this action was commenced in the superior court of Pierce county by J. D. Benner, as trustee in bankruptcy of the National Service Company, a corporation, against Orville Billings, to recover the balance due on the purchase price of certain donated paid-up treasury stock of the corporation. The complaint, in substance, alleged the incorporation of the National Service Company; that it was adjudged bankrupt on February 10, 1916, and plaintiff was appointed trustee in bankruptcy on May 17, 1916, and thereupon qualified as such trustee; that, on December 30, 1914, defendant and the National Service Company entered into an agreement wherein and whereby the company on that day sold and delivered to defendant 1,850 shares of its capital stock, then in its treasury, for which defendant then and there agreed to pay the sum of $15,900 in the following manner, to wit: $3,900 in cash, $12,000 in monthly installments of $1,000 each, the first of such installments to be paid February 1, 1915, and one thereof each month thereafter until all had been paid; that, in pursuance of said agreement, defendant paid the National Service Company on December 31, 1914,

$3,900 in cash; and that there is still due under said agreement the sum of $12,000 with interest.

To the complaint, the defendant demurred on the grounds that the court was without jurisdiction of the subject-matter; that it did not state sufficient facts to constitute a cause of action; and that the action was not commenced within the time limited by law. The demurrer being overruled, defendant filed an answer denying he purchased 1,850 shares of the stock, or any at all, claiming the transaction was only an option to purchase the stock on which he admitted he paid $3,900; denied owing $12,000, or any other sum; and affirmatively set out in considerable detail the history of the transaction upon which the suit is based, giving his version, explanation, and interpretation of, and alleging errors contained in, certain records concerning the transaction from and by which he claimed the deal was only an option to purchase, and not a purchase; and further alleged that he and his successors in interest had fully paid for the 1,850 shares of stock alleged to have been taken under an option agreement only; and that the alleged agreement for the purchase of 1,850 shares of stock, if ever made, was not enforceable because he signed no agreement, contract, note or memorandum thereof, in writing, as required by the statute of frauds, and that he relies on § 5289 of Rem. Code as a defense to the action. A reply of denials was filed to the affirmative portions of the answer. Upon trial to the court without a jury, there were findings, conclusions, and judgment entered in favor of plaintiff in the sum of $6,071.62, including interest. Defendant has appealed.

Upon the whole record, we find the controlling facts to be about as follows: Two persons, as partners, were engaged in an advertising scheme somewhat

similar to the "Green Trading Stamp" idea; and in September, 1914, they incorporated the business under the name of "The National Service Company." The capital stock of the company was paid for by transferring to it the partnership business, and the company assumed all the debts of the partnership. The company received into its treasury the gift of some of its stock to be sold for needed funds. Its principal place of business was in Tacoma, it was doing business in Portland and attempted to establish itself in Seattle. Appellant was solicited to purchase some of this donated paid-up stock. He became interested and did buy. After preliminary negotiations, the deal involved in this suit is best explained by the record made of it at the time. The minutes of a meeting of the trustees of the corporation held on December 30, 1914, at its office, after showing who were present and that the meeting was called to order, recite, among other things, the following:

"Upon motion duly made and seconded, Orville Billings was elected trustee, to serve out the unexpired term of Mr. Butt, and until his successor should be elected and qualify. *Mr. Billings having taken the trustee's oath, was admitted to the meeting. . . .* Mr. Billings made a verbal offer to the trustees to purchase 1,850 shares of the capital stock of this company, and to pay therefor the sum of $15,900, and to pay for the same in the following manner: $3,900 in cash, and the balance at the rate of $1,000 per month, the first payment to be made February 1, 1915. Upon motion duly made and seconded, it was resolved that the aforesaid offer be accepted, and that this company sell, out of the shares of stock held in the treasury of the company, 1,850 shares to Mr. Billings for the sum of $15,900, payable, $3,900 in cash, the balance at the rate of $1,000 per month, payments beginning February 1, 1915. The meeting thereupon proceeded to the election of a president and manager of the

company.　Upon motion duly made and seconded, Orville Billings was elected president of the company.''

It may be here mentioned appellant denies he was at the meeting; and of others present, some testify he was there, while others say they do not remember if he was.

It appears that appellant had already paid and been given credit for $1,000 on this sale, and on the next day, December 31, 1914, he paid and was given credit for $2,900.　At the same time, he was charged up with $12,000 and the ''stock in treasury'' account credited with 1,850 shares.　The minutes of the next meeting of the trustees, January 8, 1915, show, among other things:

''Present, the following-named trustees, Orville Billings, J. T. Gregory, James R. Thompson, Herbert E. Post.　President Billings called the meeting to order. . . . *The minutes of the previous trustees' meeting of December 30, 1914, were read and approved.* . . . It being reported to the meeting that Mr. Billings had paid $3,900 on his stock subscription at this time, and that the certificates of the stock purchased by him should be deposited in some independent escrow, the following resolution was moved, seconded, and unanimously carried:　Resolved that stock certificates Nos. 29, 30 and 31 of this company, for 1,060, 350, and 790 shares of stock, respectively, *made out in the name of Orville Billings,* be deposited in the Bank of California, N. A., of this city, in escrow, to be held by said bank and delivered over to Mr. Billings, or his order, upon payment of the sum of $12,000, and that a copy of this resolution be delivered to the said Bank of California, N. A., as its instructions herein.''

The minutes of this meeting were signed by Orville Billings as president.　The minutes of the annual stockholders' meeting of the corporation, January 11, 1915, show, among other things:

"The meeting was called to order by President Billings. . . . Upon roll call it was ascertained that the following stock was present and represented either in person or by proxy: Orville Billings, 2,200 shares." [Other names and number of shares.]

The meeting was adjourned until the next day, and the minutes were signed by Orville Billings, president. The minutes of the adjourned stockholders' meeting, January 12, 1915, show that Orville Billings as president called the meeting to order and represented 2,200 shares of stock. These minutes were signed by him as president. It appears that, about or soon after the purchase of the 1,850 shares, the appellant purchased, for $1,100, 350 other shares from a stockholder (which accounts for the total of 2,200 shares mentioned in the minutes), and later on, from time to time, made other purchases until he finally held 2,800 of the total 5,000 shares of the capital stock of the corporation. It appears that, soon after appellant took charge of affairs, there was an informal understanding he should · receive twenty-five per cent of all net profits of the company (later at a trustees' meeting changed to $500 per month) for his services as president and manager, and provided also a change in his contract of purchase of stock from payments of $1,000 to payments ·of $500 per month. The company was, during all this time, involved and appellant advanced his personal funds to keep the company going, until, at a trustees' meeting, May 3, 1915, according to the minutes, appellant, who presided, mentioned therein as having purchased 2,200 shares of the capital stock, was given credit thereon in the sum of $2,768.81 on account of advancements made for the benefit of the company, and also $2,000 on account of salary earned since *January 1, 1915.* At this meeting, it was by reso-

lution provided that appellant having paid all but
$5,231.19 for the 2,200 shares of stock purchased by
him, it should be considered that he be relieved from
the payment of the balance and excused from his
agreement to purchase stock represented by that bal-
ance. These minutes further show that another trus-
tee,

"expressed a desire to take charge of the active
management of all the business of said company and
relieve the said Orville Billings of the said work as
president and general manager thereof, and offered
to devote his time and services to the furthering of
the business of the company at the salary which the
company had been paying to Mr. Billings, if the com-
pany would transfer to him, or authorize Mr. Billings
to do so, the shares of stock which had been bought
by Mr. Billings but had not been paid for, and if they
would accept him as a purchaser thereof and as a
debtor therefor in the place of Mr. Billings;"

and that thereupon, by resolution, the offer and plan
were adopted. The minutes of this meeting were
signed by Orville Billings as president. This new
manager, without financial responsibility, according to
the testimony, never received any of the stock, and if
he served as manager, it was for a short time only,
after which he entered some private employment of
appellant. Later on, this same stock of appellant's
purchase, remaining unpaid for, was attempted to be
put off on one Stearns, chosen as manager, with a
large salary, but he failed to accomplish anything.
Stearns was without means and practically unknown
to all the officers of the company except appellant.
Appellant is a man of large means and business abil-
ity. He controlled the affairs of the company after
he became its president and manager. Friction arose
between him and other officers, who resigned. As to

the condition of the company when he went in, he testified:

"I found there was considerable indebtedness. I found they owed the P. S. B. & T. Co. $1,100, and all the money I put in this deal went to pay debts. The $3,900 paid in went to pay debts. There was no question I was buncoed."

He explained his purchase of stock by saying, as he was going into it to work, he wanted to reap the benefits if he made it a winner. He testified:

"On February 20, 1915, when my salary was fixed at $500 and after I had paid in $3,900, there was still some $4,200 of indebtedness against the company. At that time the company didn't have very much assets, and I have never been able to find that they ever did have very much assets."

After the trustees' meeting of May 3, 1915, he never called to get the 1,531 shares the company found he had then paid for, as to which he said, "I didn't care much about them. I didn't figure they were worth anything." He said the manager who succeeded him never paid him anything for the remaining 679 shares. In fact, the stock was never delivered by him until he turned it over to Stearns, as to which he testified:

"Well, I rather considered it the same as a gift, because I had got to the point then where I could not see any point of the National Service Company making anything, and any transactions I made after that I would almost consider a gift, because I didn't think it was worth anything."

During appellant's management, about February 20, 1915, a number of officers who had given their personal notes for stock surrendered all claims to the stock in cancellation of their notes. About May 4, 1915, an action was commenced in the superior court of King county to have a receiver appointed for the

company. Successfully resisting such appointment, appellant made an affidavit setting up his contract of purchase of the stock and his agreement and ability to pay $1,000 per month therefor. This affidavit was made subsequent to the meeting of the trustees purporting to change his payments to $500 per month, and after the meeting attempting to release him altogether and to fasten his obligation upon the succeeding manager. On September 20, 1915, upon complaint of appellant, a receiver for the company was appointed by the superior court of Pierce county. Thereupon a petition in bankruptcy was filed in the United States district court and the company was adjudged a bankrupt. In the bankruptcy proceedings, claims were proved and allowed in the sum of $4,313.29, and respondent, who qualified as trustee, was directed to bring this suit.

The first assignment of error is the overruling of the demurrer to the complaint. Appellant contends the contract declared upon is void, as by its terms it was not to be performed within one year. This is the same contention made by affirmative matter set out in the answer. Reliance is had on § 5289 of Rem. Code, to the effect that any agreement, contract, or promise shall be void unless it is in writing and signed in cases where by its terms it is not to be performed within a year; and our attention is called to the case of *Union Sav. & Trust Co. v. Krumm,* 88 Wash. 20, 152 Pac. 681. Neither the statute nor the case cited is applicable here. The statute covers situations like that discussed in the case cited where the subject-matter is the rendition of services, the case holding that an oral contract for a year's services, which is to commence *in futuro,* is within the statute. This is not such a case, but a sale and delivery of the stock of a

corporation, upon which a partial payment was made. It is not a contract for the sale of stocks at a future date, but a consummated sale. Such a transaction constitutes the sale and delivery of goods, wares and merchandise, according to the authority of *Hewson v. Peterman Mfg. Co.,* 76 Wash. 600, 136 Pac. 1158, Ann. Cas. 1915D 346, 51 L. R. A. (N. S.) 398, and certainly deferred payments thereon are enforceable, even if by the terms of the contract they reach beyond the period of one year.

It is further argued the complaint is insufficient for failure to allege respondent, as trustee, is without sufficient funds to pay all the creditors and the expenses of the bankruptcy proceedings, and the case of *Hibschman v. Bevis,* 103 Wash. 317, 174 Pac. 5, is relied on. The case is not in point. It was a suit to set aside a *fraudulent conveyance,* which, being good between the parties, could not be set aside by a creditor or a trustee in bankruptcy if the debtor had sufficient other property to pay his debts. Here, respondent, who represents the company, is suing to recover a debt due by appellant directly to the company which has been judicially declared to be a bankrupt, and the question if this money is needed to pay debts is wholly immaterial. Nor does the case of *DeMuth v. Faw,* 103 Wash. 279, 174 Pac. 18, help appellant; for it was a suit by a creditor to collect a debt due by a corporation then in the hands of a trustee in bankruptcy. It is also claimed there was no tender of the stock at and before suit. The complaint alleges it was sold and delivered. In this respect, so far as the proof is concerned, the attempt made by appellant, after he practically became the company, by a so-called escrow to circumvent his contract, will in no sense alter the terms of the contract. Even after the meeting at

which he presided declared he was entitled to receive 1,531 shares of the stock, he declined to call for it because it was not worth having; and later he transferred the remaining 679 shares to Stearns, considering it in effect a gift.

Assignments of error 2 to 19 relate to findings and conclusions signed and the refusal of the court to sign those presented by appellant. They present what counsel claim is the pertinent question in the case, viz., was the transaction a sale, or was it an option? This is more largely a question of fact. Notwithstanding some testimony to the contrary by witnesses who were allowed to explain their understanding of the deal, the record written and made by those same witnesses is plain that the transaction was a sale. The conduct of appellant after the initial transaction, while he was in control of the affairs of the company, pictures well but an attempt on his part to evade his obligation. The law will not permit him, at all times cognizant of the growing insolvency of the company, by such subterfuge to become released from his contract—which was about the only tangible valuable asset the company had at all times after he became connected with it—to the detriment of the rights of its creditors. On this subject the American rule, which results from the trust-fund doctrine, is that the funds of a corporation cannot be thus frittered away. The obligation of appellant in this case to pay for the treasury stock of the corporation was one of its assets, and it is clear he could not be altogether released from its payment, or his liability therefor limited by any agreement or arrangement between himself and the corporation or its agents, or by any resolution adopted by its directors, or by the stockholders themselves, to the prejudice

of the creditors. Nor could there be any reduction of the number of shares to be paid for, nor escape from liability by a transfer of shares to a person who for any cause is incapable of responding in respect of such liability, as against the rights of existing creditors. 7 R. C. L. 358, § 339; *Nathan v. Whitlock,* 9 Paige Ch. (N. Y.), 151; *National Carriage Mfg. Co. v. Story & Isham Commercial Co.,* 111 Cal. 531, 44 Pac. 157; *National Bank v. Case,* 99 U. S. (9 Otto) 628.

The only other assignment of error that need be noticed is that the court allowed interest on $5,231.19, the unpaid installments of the purchase price of the stock. The amounts and dates of maturity were certain and fixed by the positive terms of the contract, the forbearance of which, under the terms of the statute (Rem. Code, § 6250), called for interest at six per cent per annum, the amount allowed in the judgment.

Judgment affirmed.

CHADWICK, C. J., TOLMAN, MACKINTOSH, and MAIN, JJ., concur.