[No. 16313.     Department One.     August 8, 1921.]

J. I. FARRIER et al., Respondents, v. RITZVILLE WAREHOUSE COMPANY, Appellant.[1]

CORPORATIONS (26, 27)—BY-LAWS—AMENDMENT. A by-law of a corporation, discriminating, within reasonable limits, respecting dividends payable to stockholders who deal with the corporation and thereby increase its profits, and those who do not deal with it, is a valid exercise of corporate power.

SAME (69, 70)—DIVIDENDS—VESTED RIGHTS OF STOCKHOLDERS. Where a corporate by-law gave stockholders a ten per cent dividend on the par value of their stock and distributed the balance of the net profits to the stockholders hauling and selling wheat to the company, an amendment of the by-law reducing the dividend of the common stockholders to seven per cent against their protest was invalid as an interference with vested rights.

SAME (69, 70). Stockholders having a vested right in dividends, are not estopped to object to an amendment of the by-laws affecting their rights, where they acted promptly, although they failed to act and are estopped as to a prior amendment.

[1]Reported in 199 Pac. 984.

Appeal from a judgment of the superior court for Adams county, Truax, J., entered January 19, 1920, in favor of the plaintiffs, in an action for equitable relief, tried to the court. Modified.

*C. W. Rathbun,* for appellant.

*Adams & Miller,* for respondents.

MACKINTOSH, J.—In 1907, the appellant was incorporated for the purpose of conducting a farmers' grain and warehouse business, and adopted, as one of its by-laws, a provision that the dividends of the corporation should be distributed among the stockholders by an equal distribution to them of fifty per cent thereof, and that the remaining fifty per cent should be divided among the stockholders hauling and selling wheat to the company, in proportion to the amount of wheat so sold and hauled. Another by-law provided that the by-laws might be amended, repealed or altered by a majority vote of the stockholders.

The respondents were subscribers to, and original stockholders in, the appellant company. Over the objection, or, at least, without the consent of the respondents, the by-law in regard to dividends was amended in 1912, so that the stockholders should receive ten per cent dividend on the par value of their stock, and the balance of the net profits should be distributed among the stockholders hauling and selling wheat to the company, in proportion to the amount so hauled and sold. In June, 1919, over the protest of the respondents, this by-law was again amended so that the dividends should be paid to each stockholder at the rate of seven per cent on his stock, and the balance of the net profits should be divided among the stockholders hauling and selling wheat to the company, in proportion to the number of bushels so hauled

and sold. The respondents thereupon instituted this action to enjoin the corporation from distributing profits in accordance with this latest by-law.

As stated by Thompson, Corporations, § 971:

"A corporation authorized by its charter to make such by-laws as may be necessary to attain the objects for which it is created and to carry on and transact its business affairs, on the plainest principles of right, as well as by its inherent power, has the power to alter, amend or repeal such by-laws from time to time, when necessary to carry out the objects of the corporation or for the better conduct of its business. 'The power to enact by-laws' said the Supreme court of Indiana, 'is inherent in every corporation as an incident of its existence. This power is a continuous one. No one has the right to presume that by-laws will remain unchanged. Associations and corporations have a right to change their by-laws when the welfare of the corporation or association requires it, and it is not forbidden by the organic law. The power which enacts may alter or amend'. This power to amend or repeal by-laws, even when expressly conferred by the charter, it must be remembered, cannot be exercised by the corporation itself in such manner as to impair any rights that have been given and vested by virtue of such by-laws."

The question then arises in this case whether these amendments to the by-laws are invalid by reason of their affecting or destroying vested rights. In other words, whether the respondents, at the time that they became subscribers to the capital stock of the appellant, had a vested right given them by the then existing by-laws in the distribution of dividends, fifty per cent to the stockholders, the remaining fifty per cent to such stockholders as might have done business with the company.

There is no question that the original by-law is a valid exercise of the powers of the company; the rule

being, that a by-law may discriminate within reasonable limits between stockholders who deal with the corporation and who thereby increase its profits, and those who do not deal with it. *Mooney v. Farmers' Mercantile & Elevator Co. etc.,* 138 Minn. 199, 164 N. W. 804. This right has been tacitly recognized by this court in the case of *Johnson v. Goodenough,* 103 Wash. 625, 175 Pac. 306. The briefs of neither party refer to any case which bears directly upon the point before us, and so far as our independent search has led us, the case most nearly in point upon the question here is that of *Kent v. Quicksilver Mining Co.,* 78 N. Y. 159, which is a thoroughly considered authority, and the reasoning of which seems conclusive. The facts in that case were that the shares of the capital stock in the company involved in that litigation were divided equally in amount, and were entitled to an equal distribution of dividends, but thereafter, by a majority vote of the stockholders, the stock was divided so that a portion of it was given preference over the other in sharing in the earnings. The New York court, in passing upon these questions, said:

"Then there arises the query, whether there was at that time power in the corporation to distinguish between the stockholders in it, to form them into two classes, and to give to one class rights in the corporate property, business and earnings from which the other was shut out.

"We are not prepared to say that, at the first, the corporation might not have lawfully divided the interest in its capital stock into shares arranged in classes, preferring one class to another in the right it should have in the profits of the business. The charter gave power to make such by-laws as it might deem proper, consistent with constitution and law; and to issue certificates of stock representing the value of the property. We know nothing in the constitution or the law that inhibits a corporation from beginning its cor-

porate action by classifying the shares in its capital
stock, with peculiar privileges to one share over an-
other, and thus offering its stock to the public for sub-
scriptions thereto. No rights are got until a subscrip-
tion is made. Each subscriber would know for what
class of stock he put down his name, and what right he
got when he thus became a stockholder. There need
be no deception or mistake; there would be no trench-
ing upon rights previously acquired; no contract, ex-
press or implied, would be broken or impaired.

"This corporation did otherwise. A by-law was
duly made, which declared the whole value of its prop-
erty and the whole amount of its capital stock, and
divided the whole of it into shares equal in amount,
and directed the issuing of certificates of stock there-
for. It is not to be said that this by-law authorized
anything but shares equal in value and in right; or that
the taker of one did not own as large an interest in the
corporation, its capital, affairs, and profits to come, as
any other holder of a share. Certificates of stock were
issued under this by-law, that gave no expression of
anything different from that. When that by-law was
adopted, it was as much the law of the corporation as
if its provisions had been a part of the charter.  .  .  .
Thereby, and by the certificate, as between it and every
stockholder, the capital stock of the company was fixed
in amount, in the number of shares into which it was
divisible, and in the peculiar and relative value of each
share. The by-law entered into the compact between
the corporation and every taker of a' share; it was in
the nature of a contract between them. The holding
and owning of a share gave a right which could not be
divested without the assent of the holder and owner; or
unless the power so to do had been reserved in some
way.  .  .  .  Shares of stock are in the nature of
*choses in action,* and give the holder a fixed right in the
division of the profits or earnings of a company so long
as it exists, and of its effects when it is dissolved. That
right is as inviolable as is any right in property and
can no more be taken away or lessened, against the will
of the owner than can any other right, unless power is

reserved in the first instance, when it enters into the constitution of the right; or is properly derived afterwards from a superior law giver. The certificate of stock is the muniment of the shareholder's title, and evidence of his right. It expresses the contract between the corporation and his co-stockholders and himself; and that contract cannot, he being unwilling, be taken away from him or changed as to him without his prior dereliction, or under the conditions above stated. Now it is manifest that any action of a corporation which takes hold of the shares of its capital stock already sold and in the hands of lawful owners, and divides them into two classes—one of which is thereby given prior right to a receipt of a fixed sum from the earnings before the other may have any receipt therefrom, and is given an equal share afterwards with the other in what earnings may remain—destroys the equality of the shares, takes away a right which originally existed in it, and materially varies the effect of the certificate of stock.

"There is a power in this charter to alter, amend, add to or repeal, at pleasure, by-laws before made. It is argued from this that it was in the power of the corporate body, in due form and manner, to alter the by-law which had fixed the amount of the capital stock and the number and relative value of the shares thereof. The power to make by-laws is to make such as are not inconsistent with the constitution and the law; and the power to alter has the same limit, so that no alteration could be made which would infringe a right already given and secured by the contract of the corporation. Nor was the power to alter, to the extent of affecting the contracted relative value of a share, reserved when the share was sold to the stockholder, so as to enter into and form a part of the contract. An alteration is a *pro tanto* repeal; but no private corporation can repeal a by-law so as to impair rights which have been given and become vested by virtue of the by-law afterwards repealed. All by-laws must be reasonable and consistent with the general principles of the laws of the land, which are to be determined by the courts, when a case is properly before them. . . . A by-

law may regulate or modify the constitution of a corporation, but cannot alter it. . . . The alteration of a by-law is but the making of another upon the same matter. If the first must be reasonable and in accord with principles of law, so must that which alters it. If then the power is reserved to alter, amend or repeal, and that reservation enters into a contract, the power reserved is to pass reasonable by-laws, agreeable to law. But a by-law that will disturb a vested right is not such. . . . And it differs not when the power to make and alter by-laws is expressly given to a majority of the stockholders, and that the obnoxious ordinance is passed in due form.

"But there remains a serious question; whether, though there was at the outstart a minority of the stockholders who gave no assent to the corporate act, there has not been such tacit acquiescence and delay in action by that minority as to amount to indefensible *laches* and estoppel upon those who constituted it and their assigns. In our judgment there has; and we find here a safe place on which to rest our decisions in these cases. The findings show that the by-laws empowering the creation and issue of the preferred stock were authorized at a stockholders' meeting regularly called and held and conducted; that the stock was at once offered for subscription to all of the stockholders; that a circular informing thereof was issued by authority and distributed to the stockholders; that though all of them did not avail themselves of the chance to take it, it was not because the chance was not known; a large number of them did subscribe, and paid money for the privilege to the corporation, and that money went into the assets and business of the company; certificates for the preferred stock were thereupon issued, and it, as well as the common stock, was dealt in by the public, sales were made of the two kinds openly at the Stock Exchange, at prices for the one larger than for the other, and quoted in the daily public prints; and from year to year for four years the annual reports of the directors to the stockholders spoke of the two kinds of stock. There was ample knowledge, or means of knowledge, on the part of all stockholders, of the action of

the corporation in the creation of the two kinds of stock, of the issue of certificates for the preferred stock, of the entry of that stock into the channels of trade, of the public dealings in it at the especial marts for the sale of such property, and of the continued recognition of its existence and validity by the company and the public. It is not to be conceived that the owners of the common stock of this corporation did not have actual knowledge that there had been created a stock having ostensibly greater right and value than their own, and that it had gone into the market and was dealt in by the public interested in the validity of it. For the lapse of four years, however, there was no action of the company, or of an individual stockholder, to have a judicial declaration that the company had exceeded its powers in the creation of the stock, and that it was invalid. We think that these facts, most of which are set forth in the findings in two of the cases, warrant the conclusion of law therein, that the stockholders, by acquiescing in the action of the corporation in making the preferred stock, have ratified and assented thereto, and that the same is binding on them by reason of such assent and ratification.''

This court in two cases seems to have expressed the same idea. In *Seattle Trust Co. v. Pitner,* 18 Wash. 401, 51 Pac. 1048, it was said:

''We view the by-law relative to dividends as in effect appropriating the net proceeds arising from the company's business. Eight per cent was payable to the preferred stockholders, and a dividend was payable at the date fixed by the company. After such date was fixed and the 8 per cent, due annually, paid to the preferred stockholders, the net profits remaining were devoted to the common stockholders. This by-law had the force and effect of a contract, and we see no good reason why it should not be given its full effect.''

In *State ex rel. Gwinn v. Bucklin,* 83 Wash. 23, 145 Pac. 58, L. R. A. 1915D 285, the court observed:

'' 'Each stockholder shall have the right to inspect the books and records of the company at any time dur-

ing regular business hours of said company'. This by-law, we think, has all the force and effect of a statute containing such a provision.''

Under the original by-law, the then stockholders had stock which was to receive one-half of the dividends declared by the company, and the remaining one-half of the dividends was to be divided among such of them as did business with the company. Under the last by-law, of which complaint is now made, the present stockholders have stock which is limited to dividends in the amount of seven per cent, with the provision that out of the net proceeds a bonus shall be paid to such stockholders as do business with the company.

A very decided and marked difference is made by these two by-laws as to the participation of the stock in the profits of the corporation. Under the original by-law, the stockholders had a vested right to have dividends applied as there provided; under the last by-law, the stock is confined to a seven per cent profit, unless held by one of those stockholders who have transacted some business with the company. Whether or not, in the conduct of the business of the company, the latter provision might be more advantageous to the stockholder than was the original one, is entirely beside the question; even if more advantageous, the majority of the stockholders cannot compel the minority owners to submit to such a change. The matter is entirely for the minority stockholder's determination as to whether he is willing to allow the vested right which he has acquired under the original by-law to be taken from him, and to have substituted therefor a fixed rate of interest upon his stock investment.

The question then arises whether the respondents, having in 1912 acquiesced in the modification of the original by-law as to dividends, should not now be de-

nied the right to question the authority of the majority of the stockholders to again alter the by-laws on that subject. Although the respondents are estopped by reason of their failure to take any action to have set aside the amendment of the by-law passed in 1912, and by accepting dividends under the terms of that by-law they will not now be allowed to question its validity, it cannot be said that they are estopped from complaining of this last amendment, which materially reduced the amount of dividends provided for the common stock. Having acted promptly after the passage of this amendment, which was carried without their consent, they are now privileged to maintain this action.

The decree of the trial court will be modified so as to annul the by-law of 1919, leaving in effect and operation the one of 1912, which the respondents have estopped themselves from complaining of.

PARKER, C. J., BRIDGES, FULLERTON, and HOLCOMB, JJ., concur.